IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-50609
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee-
                                        Cross Appellant,

                    versus

JAMES SCOTT MANN; WILLIAM M. MOORE,

                                        Defendants-Appellants-
                                        Cross Appellees.


_____

Appeals from the United States District Court for
the Western District of Texas
_____

November 23, 1998

Before REAVLEY, DAVIS and DUHÉ, Circuit Judges.

REAVLEY, Circuit Judge:

       Appellants James Mann and William Moore were convicted on numerous counts relating

to their dealings with Jefferson Savings and Loan Association, McAllen, Texas (Jefferson), and its

successor institutions.  They challenge the sufficiency of the evidence and raise numerous other

grounds for reversal.  The government cross-appeals on a sentencing issue.  We affirm.

A.    *Sufficiency of the Evidence*

When reviewing the sufficiency of the evidence to support a conviction, we view the evidence, including all reasonable inferences drawn therefrom and all credibility determinations, in the light most favorable to the verdict.[1]  The verdict will be upheld if a rational jury could have found the essential elements of the offense beyond a reasonable doubt.[2]  With these standards in mind, we do not attempt a comprehensive recitation of the evidence, much of which was conflicting.  We endeavor here only to explain, after a careful review of the evidence, our conclusions regarding the sufficiency points of error.

1.    *Count 1 and Related Counts*

Mann and Moore challenge the sufficiency of the evidence on count 1 and related counts of the superseding indictment on which they were tried.  These counts concern Jefferson's purchase of oil and gas properties known as the Tartan properties in late 1982.  Count 1 charged Peter Gallaher, Moore, Julian Alsup, Charles Christensen (GMAC),[3] and Mann with conspiracy in violation of 18 U.S.C. § 371.  Generally, "[t]o establish guilt for conspiracy, the government must prove beyond a reasonable doubt that two or more people agreed to pursue an unlawful objective together, that the defendant voluntarily agreed to join the conspiracy, and that one of the members

---

[1]  *United States v. Resio-Trejo*, 45 F.3d 907, 910-11 (5th Cir. 1995).

[2]  *United States v. Walters*, 87 F.3d 663, 667 (5th Cir.), *cert. denied*, 117 S. Ct. 498 (1996).

[3]  Alsup died before trial.  Gallaher was severed from the case because his lawyer was injured shortly before trial, and later pleaded guilty to a single count.  Christensen went to trial with Mann and Moore and was acquitted on all counts against him.

2

of the conspiracy performed an overt act to further the conspiracy."[4] By its terms, § 371 provides that the unlawful objective of the conspiracy may be "to commit any offense against the United States," i.e. to commit a federal crime, or "to defraud the United States."

In order to convict a defendant of conspiracy, the prosecution must offer substantial evidence that the defendant was a member of the conspiracy.[5] However, each element of a conspiracy may be inferred from circumstantial evidence.[6] An agreement may be inferred from a "concert of action."[7] A conspiracy may exist by tacit agreement; an express or explicit agreement is not required.[8]

Count 1 charged that GMAC and Mann conspired:

(a)   to defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Federal Home Loan Bank Board (FHLBB) in the regulation, supervision, and examination of the affairs of Jefferson;

(b)   to willfully misapply monies, funds, assets, and credits of Jefferson in violation of 18 U.S.C. § 657;

(c)   to make false entries in the records, reports, and statements of Jefferson, in violation of 18 U.S.C. § 1006;

(d)   to defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of revenue, namely, income taxes; and

(e)   to make and file with the Internal Revenue Service false income tax returns in violation of 26 U.S.C. § 7206(1).

---

[4]   *United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir. 1994).

[5]   *United States v. Malatesta*, 590 F.2d 1379, 1381-82 (5th Cir. 1979) (en banc).

[6]   *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993).

[7]   *Id. (quoting United States v. Espinoza-Seanez*, 862 F.2d 526, 537 (5th Cir. 1988) (internal quotation marks omitted).

[8]   *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1059-60 (1998).

Regarding the underlying substantive federal offenses referenced, establishing an offense under 18 U.S.C. § 657 requires proof that the accused was an officer, agent or employee of, or connected in some way with, a federally insured savings and loan association, he willfully misapplied funds of the association, and he acted with intent to injure or defraud the association.[9] To establish a false entry in violation of 18 U.S.C. § 1006, the government must prove that the accused was an officer, agent, or employee of a lending institution authorized by and acting under the laws of the United States, that he knowingly and willfully made, or caused to be made, a false entry concerning a material fact in a book, report, or statement of the institution, and that he acted with the intent to injure or defraud the institution or any of its officers, auditors, examiners, or agents.[10] A violation of 26 U.S.C. § 7206(1) is established by proof that the accused willfully made and subscribed to a tax return, the return contained a written declaration that it was made under penalties of perjury, and the accused did not believe that the return was true as to every material matter.[11]

A rational jury could have found the following based on the evidence presented. Jefferson was a financially troubled institution, owned by Guillermo Cartaya. Mann and GMAC were interested in acquiring Jefferson. Mann and GMAC had become acquaintances through various business dealings. Mann dropped out of the acquisition group, in part because of concern that his prior bankruptcy might concern regulators. GMAC, principally through Moore, and Mann

---

[9] *Faulkner*, 17 F.3d at 771.

[10] *United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995).

[11] *United States v. McCord*, 33 F.3d 1434, 1450 (5th Cir. 1994).

4

hatched a byzantine scheme to acquire Jefferson by stealing $4 million of the institution's own assets. This fraud was effected when Mann purchased the Tartan properties for $9.6 million, and simultaneously sold the properties to Jefferson for $13.8 million, thus clearing a $4.2 million profit. Mann ultimately kept part of the profit, and transferred part of the profit to GMAC, who then used the funds to buy Jefferson.

Mann located the Tartan properties, which were for sale. In dealing with the sellers, Mann purported to be acting as an agent or "trustee" for Jefferson, even though GMAC had not yet acquired Jefferson. Mann used a company he had incorporated a few months earlier, Camco Financial Corporation (Camco), in the course of negotiations to buy the Tartan properties. Mann negotiated a $9.6 million purchase price with Forbes Gordon, acting on behalf of the owners of the properties. Mann testified in a civil deposition that he dealt exclusively with Moore in negotiating to sell the properties to Jefferson, and that Moore knew what Mann was paying for the properties. In December of 1982, Moore and Fred White, who wanted to remain as president of Jefferson, caused Jefferson to wire $13.8 million in cash from Jefferson to Mann's Camco "trustee account." Of these funds, $9.6 million went to the sellers of the Tartan properties. The properties were assigned to Jefferson. In monthly and quarterly filings with the FHLBB, Jefferson reported assets based on the $13.8 million price it had paid for the Tartan properties, rather than the $9.6 million price Mann had paid.

Of the $4.2 million profit Mann made on the purchase and simultaneous sale of the Tartan properties, Mann proceeded to funnel $4 million to GMAC, who ultimately used the funds to acquire Jefferson. The transactions that followed in the space of a few days could not have been less straightforward. Hitting the high points, Mann kept $200,000 of the profit. Camco paid off

5

$4 million in debt on a shopping center owned by Parkway Square Joint Venture, in which Moore and Gallaher had an interest. The shopping center was transferred to Parkway South Development Corporation (PSDC), a company controlled by Moore and Gallaher. PSDC issued a $4 million promissory note to Camco (the PSDC note). Jefferson paid PSDC approximately $6 million in cash and three parcels of land for the shopping center. PSDC transferred approximately $5 million in cash to GMAC, and GMAC executed a note to PSDC. The GMAC partners also individually signed $900,000 notes payable to PSDC. GMAC paid Cartaya, the owner of Jefferson, $5 million in cash for his stock in Jefferson. Cartaya transferred $1.5 million in cash to PSDC and received three parcels of land. Mann later sold the $4 million PSDC note to Alsup and Christensen for approximately $1 million in cash, property and a note. Payments were not made on the PSDC note. For years after GMAC acquired Jefferson, PSDC filed tax returns identifying a $4 million "loan from stockholders," rather than revealing $4 million in income to GMAC that was used to acquire Jefferson.

Two former members of the Jefferson board testified that the old board had not approved the acquisition of the oil and gas properties, and that a board resolution purporting to state otherwise was false. A rational jury could find that Moore or another conspirator fabricated the board resolution approving the transaction before GMAC acquired Jefferson.

A rational jury could find that the price Jefferson paid for the Tartan properties was grossly inflated. First, the very nature of the transactions support such a finding. Mann and Gordon, on behalf of the sellers, reached an arms-length price that was $4.2 less than the price Jefferson paid. The incentive on the part of those who controlled Jefferson to cause Jefferson to overpay is manifest: GMAC were thereby able to use Jefferson's own federally insured deposits to

6

acquire Jefferson; Mann personally profited by over $1 million; and Cartaya was able to unload his troubled institution and walk away with approximately $5 million in cash and real estate. The rank self-dealing, by itself, is compelling evidence that Jefferson paid too much. The complex nature of the transactions and appellants' efforts to conceal them from federal regulators (discussed further below) casts further doubt on the legitimacy of the price Jefferson paid.

Other evidence, though conflicting, supports a finding that Jefferson paid far too much for the Tartan properties. Gordon testified that sophisticated parties almost always look to evaluation studies when buying oil and gas properties such as the Tartan properties. Mann and Gordon reviewed such a study prepared by Ron Lenser, and referred to that study in their purchase agreement. While the evaluation gives a discounted net future income figure of $13.5 million for the properties, Gordon was adamant at trial that this figure is not consistent with the fair market value of such properties. He testified that, in part because of the risk associated with such properties, as opposed to a safer investment, the $13.5 million figure "does not say they are worth 13.5 million dollars . . . . [T]here's no way that anybody is going to pay you 13 million dollars, in my opinion for oil property, I don't think." Asked what he would say if such a price had been proposed, Gordon responded "I wouldn't pay any attention to you. I would tell you to take a walk." Lenser testified that the future net income figure was not the same as fair market value and that he so stated in his report. He calculated the fair market value of the properties at $9.2 million. Another expert at evaluating oil and gas properties testified that the net future income figure in the Lenser report does not correspond to fair market value, due to risk factors, and that the figures in the Lenser report indicate a fair market value of about $8.5 million for the Tartan

7

properties. Jefferson tried to sell the properties in 1983. No formal offers were made, and the highest prices that potential purchasers "kicked around" were $3 to $3.5 million.

David Thornberry, an attorney, testified that his firm was approached by Mann, Moore, Christensen and Gallaher in September of 1982. They represented to Thornberry that they were in the process of acquiring Jefferson. At the outset Thornberry thought he was representing both Moore and Mann. Thornberry met with Moore and Mann regarding the Tartan properties. Thornberry's notes indicate that "we've agreed to purchase [the Tartan properties], probably a ten million-dollar transaction." Thornberry drafted legal documents pertaining to the sale of the Tartan properties. He understood that "nine-point-something million dollars was the . . . final negotiated price." Mann never explained to Thornberry that he was "going to have Camco resell the oil and gas properties over to Jefferson Savings for 13.8 million dollars," or hand over $4 million of excess funds Jefferson paid for the oil and gas to GMAC to buy the institution.

GMAC and Mann did not reveal the true nature of the transactions to regulators. Attorney Ben Plotkin[12] and his firm prepared the notice of change in control for Jefferson that was required by the FHLBB. The notice, signed by each of the GMAC partners, required answers to pre-printed questions. The notice was prepared based on information provided by GMAC. Plotkin spoke with Moore several times. Moore never told Plotkin that the oil and gas transaction was part of the financing for the acquisition of Jefferson. The notice asked the source of funds for the acquisition and whether "any part of such funds is to be borrowed or otherwise obtained for the purpose of making the acquisition." GMAC did not indicate that any of the funds

---

[12] Plotkin later was hired by Moore as an officer at First Federal Financial, the GMAC holding company that owned Jefferson and two other thrifts. Plotkin also became a director of Northwest Savings Association, the successor of Jefferson.

had come from Jefferson itself or from Camco, or that GMAC and PSDC had signed the related promissory notes described above. David Cockcroft, the FHLBB official who reviewed the notice, testified that it did not disclose that the acquirers intended to cause Jefferson to pay $13.8 million cash for the Tartan properties, and that $4 million of this amount would be used to acquire Jefferson. In Cockcroft's opinion, the failure to disclose these transactions meant that GMAC had not acquired the institution under the terms and conditions stated in the notice. If these transactions had been disclosed, "we would have looked with suspicion or with great concern about any significant assets going out of the institution," which had a net worth of only $4 million at the time.

The FHLBB conducted a examination of Jefferson in 1983 that lasted several months. The assigned agents met with Moore and White, and focused on the oil and gas properties, among other things. They requested documentation underlying the investment. Jefferson provided them a copy of the purchase agreement between Camco and Jefferson whereby Jefferson paid Camco $13.8 million for the properties. They were not told or provided documentation that Mann had paid only $9.6 million for the properties. One of the agents testified that if they had been told that the acquisition of GMAC depended on the purchase of the oil and gas properties, "[i]t would have been a big red flag as far as the examiners were concerned."

In 1985, in the course of an IRS examination of GMAC, Jefferson, and other entities, Gallaher told the agent performing the examination that the funds for the acquisition of Jefferson had come from InterFirst Bank, Alsup and Christensen, rather than from Jefferson itself. Moore told the agent that the acquisition funds came from loans from PSDC. In 1988, after agent Burns concluded that each of the GMAC individuals "had received one million dollars of income from

9

Jefferson Savings and Loan through the Camco entity for the purchase of the stock of Jefferson," the IRS sent deficiency notices to GMAC. GMAC responded with a tax suit claiming that "these dollars were loans," rather than taxable income. In a March 1987 depositions before the FHLBB, Gallaher denied knowing where Mann got the money for the $4 million PSDC loan, and denied knowledge of who had sold the Tartan properties to Jefferson. Christensen denied knowing the identity of the seller of the Tartan properties. Moore denied knowing that Mann was the seller of the properties.

In summary, a rational jury could find that Mann and Moore participated in a conspiracy whereby: (1) Mann sold the Tartan properties to Jefferson at an inflated price; (2) Mann, for personal financial gain, and GMAC used the profits from the sale of the Tartan properties to transfer ownership of Jefferson to GMAC, in effect misapplying Jefferson's own assets to acquire Jefferson, at a time when the institution was already in poor financial shape; and (3) the conspirators concealed the true nature of the acquisition scheme from federal banking authorities; (4) overstated the assets of the institution to perpetuate GMAC's control of it; and (5) filed false returns with the IRS to conceal the nature of their transactions and avoid taxes. The evidence is sufficient on count 1.

The evidence was also sufficient on count 2, which charged that GMAC, aided and abetted by Mann,[13] made a false entry on the books of Northwest Savings Association (Northwest) by overstating the value of Jefferson Energy Corporation, which held the Tartan

---

[13] A defendant is guilty of aiding and abetting a criminal offense when he associates with the criminal activity, participates in it, and acts to help it succeed. *United States v. Pedroza*, 78 F.3d 179, 183 (5th Cir. 1996). "Typically, the same evidence will support both a conspiracy and an aiding and abetting conviction." *United States v. Singh*, 922 F.2d 1169, 1173 (5th Cir. 1991).

properties, in violation of 18 U.S.C. § 1006. Jefferson changed its name to Franklin Savings Association-McAllen, and was merged into Northwest in December 1983. Northwest remained under the control of GMAC. The evidence showed that Jefferson continued to carry the value of Tartan properties at an inflated priced derived from the original purchase price to Jefferson.

Mann and Moore argue that the acquisition of the Tartan properties was a "value for value" transaction that cannot be considered criminal, under the reasoning of *United States v. Beuttenmuller*.[14] In *Beuttenmuller*, Shamrock Savings wanted to sell unproductive real estate known as the Tanglewood property. Defendant Gill and his partner Billings wanted additional financing for a real estate development known as the Mansfield property. Through a complex transaction, (1) a subsidiary of Shamrock purchased an interest in the Mansfield property, (2) a newly created entity controlled by Gill and Billings bought the Tanglewood property from Shamrock, (3) proceeds from the sale of the Mansfield property interest were used to make the down payment on the Tanglewood property, (4) the remaining balance due on the sale of the Tanglewood property was financed through a non-recourse loan from Shamrock, and (5) Shamrock recorded a profit on its books as a result of the sale of the Tanglewood property.[15]

We reversed the convictions of the Shamrock president, Gill and Beuttenmuller, an attorney who documented the transactions, on all bank fraud counts, including a conspiracy count alleging a conspiracy to make false entries and misapply funds. We found nothing illegal per se when a savings association sells its own real estate and loans money for the purchase price, or when a borrower uses the proceeds from a separate sale of property to the lender as the down

---

[14] 29 F.3d 973 (5th Cir. 1994).

[15] *Id*. at 975-77.

11

payment. We held that the transactions amounted to a "cash for trash" transaction in violation of the bank fraud statutes, rather than a legitimate "value-for-value" transaction, only "(1) if the Mansfield property had *no* value; or (2) if the value of the Mansfield property was so low that the transaction was essentially a sham designed to cover the fact that Shamrock Savings was gratuitously providing Gill and Billings with the down payment money for the purchase of [the Tanglewood property]."[16] Because the government could not prove either condition, we reversed the convictions. We concluded that "no criminality can be attached to [defendants] because the bottom dropped out of the real estate markets."[17]

We believe that *Beuttenmuller* is factually so different from the pending case that it cannot control the result here. The nature of the alleged fraud in *Beuttenmuller* was that the defendants employed a "cash for trash" scheme to avoid regulations requiring a down payment for real estate. "A 'cash for trash' scheme is an illegal scheme that allows an institution to sell [real estate owned] that has been wholly financed in violation of banking regulations that require at least a twenty percent down payment."[18] In the pending case the government proved a far more sinister conspiracy. The conspiracy was not merely one to avoid regulations requiring a down payment. The rankest form of self-dealing was demonstrated. As explained above, the government proved that Mann purchased the properties for $9.6 million, and in concert with Moore, caused Jefferson simultaneously to pay $13.8 million for the property. On the difference in price, Mann pocketed $200,000 up front, and was later rewarded with another $1 million when he sold the PSDC note.

---

[16] *Id*. at 979-80.

[17] *Id.* at 983.

[18] *Id.* at 979.

The remainder of Mann's initial profit was funneled to Moore and others in an elaborate scheme that allowed them to take over Jefferson. In effect, appellants stole millions of dollars from Jefferson to enrich themselves and take over Jefferson. This is a more egregious form of fraud, in our view, than simply trying to skirt regulations requiring a down payment on real estate loans. On these facts, we do not read *Beuttenmuller* to hold that appellants escape liability as long as the oil and gas properties had some value. Further, this is not a case where defendants are being judged with hindsight because "the bottom dropped out of the real estate markets."[19] The essence of the fraud here was that Mann negotiated an arms-length price, and then simultaneously sold at a much higher price to personally profit and provide funds for the purchase of Jefferson by GMAC. This case is more akin to "land flip" cases where a single property is bought and sold simultaneously, and the difference in price is diverted to illicit purposes.[20] In such cases, criminality is not avoided merely by showing that the property that was "flipped" had some value.

Moore argues that the evidence was insufficient on counts 26 and 27. These counts charged that Moore filed 1987 and 1988 corporate tax returns for PSDC, falsely claiming a $4 million "loan from stockholders," in violation of 18 U.S.C. § 7206. The returns also had corresponding or related line items for "loans to stockholders." The government's theory was that the PSDC loan was a sham because it was never intended to be repaid, and that the tax returns were an effort to characterize funds traceable to Mann's sale of the Tartan properties as a loan, rather than income to GMAC, allowing GMAC to avoid personal income taxes. It offered

---

[19] *Id*. at 983.

[20] *See, e.g, United States v. Aubin*, 87 F.3d 141, 144 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 965 (1997); *Faulkner*, 17 F.3d at 751-753.

13

evidence, described above, that the "loan" funds originated with Mann's sale of the Tartan properties to Jefferson, which were used to pay off the shopping center which was then bought by Jefferson. The proceeds of the sale of the shopping center to Jefferson were then used by GMAC to buy Jefferson, consistent with the government's theory that GMAC used Jefferson's own money to acquire it. Moore's own accountant was confused by the supposed loans and was concerned that there was no documentation to support them. The PSDC loan was not repaid. In filings with the FHLBB , Mann did not include the PSDC note as an asset on Camco's financial statements. A rational jury could find that the loan was a sham, and that the entries on the tax returns were part of an effort to allow GMAC to avoid declaring millions of dollars in income. More specifically, the jury could find that instead of having PSDC report millions of dollars in dividends to GMAC, or payments to GMAC via 1099 forms, the conspirators treated the $4 million transfer from Camco as a loan in the PSDC tax returns. We find the evidence sufficient on counts 26 and 27.

2.    *Count 30 and Related Counts*

Mann and Moore challenge the sufficiency of the evidence on count 30. This count alleged a conspiracy whereby GMAC and Mann caused Northwest, the successor institution of Jefferson, to swap the stock in the subsidiary holding the Tartan properties for a piece of real estate owned by Mann. The property swap was part of an alleged conspiracy to "willfully misapply money, funds, assets, and credits of Northwest Savings," and "to fraudulently make and cause false entries in the records, statements, and reports of Northwest Savings." The alleged objectives of the conspiracy were "to fraudulently maintain the inflated net worth of Northwest Savings Association and to prevent regulatory intervention by the Federal Home Loan Bank

14

Board," and "to transfer ownership and control of Northwest Savings to Defendant Mann by fraudulent means."

A rational jury could find the following. In 1984, Northwest still owned the Tartan properties and was still controlled by GMAC. Northwest was a financially troubled institution. In October 1984, the FHLBB informed Northwest that it was insolvent and that the directors should make efforts to infuse capital or otherwise increase the institution's net worth. GMAC responded with a letter to the FHLBB, informing it that it intended to increase its net worth by swapping its oil and gas properties for a tract of land known as Bridgepoint. The letter states that the real estate to be acquired "would have an appraised value equal to or greater than the present book value of" the oil and gas investment. Bridgepoint was part of a larger tract Mann had purchased through Camco from Pinnacle/Affiliated Joint Venture (Pinnacle). For business reasons unrelated to this case, Pinnacle had released its vendor's lien on the rest of the tract, leaving Bridgepoint saddled with $7.1 million in debt. Mann, by way of a guaranty, was personally liable for $1 million of this debt.

Mann told Dick Matz, who had helped Mann with financing on the Bridgepoint property, that he was purchasing Northwest and that the swap was part of the consideration. In December 1984, Northwest, through GMAC, swapped the Tartan properties (through a transfer of stock in Northwest's energy subsidiary) for Bridgepoint. Northwest assumed Mann's personal guaranty and Camco's $7.1 million debt on the Bridgepoint property. Northwest paid $1.1 million in principal and interest due to Pinnacle on December 30.

A rational jury could find that while the Tartan properties were worth millions of dollars, Bridgepoint had a negative net worth, due to the $7.1 million debt on the property. In late 1983,

15

Patrick McClusky, an MAI appraiser, had appraised Bridgepoint at $3.2 million if it was sold separately. Eve Williams, another MAI appraiser, worked for First Franklin Appraisal Company, a subsidiary of Franklin Savings, which was controlled by GMAC. In early 1985 she appraised the property at $4.5 million. These appraisals did not consider debt on the property. Williams' boss asked her to "to keep looking at the lot values and the absorption to make sure that [she] had taken into consideration how good, how nice this piece of property was." Frustrated and confused, she asked her boss, "you know, what's the magic number?" Her boss, "who didn't look like he was real serious about it," said the magic number was $19 million. Williams testified there wasn't any way she could come up with that evaluation.

In 1986, the FHLBB conducted an examination that included an investigation of the Bridgepoint swap. One examiner was concerned that the swap "didn't make any sense," and another, Steven Taylor, "couldn't understand the economic justification for Northwest's part of the deal." An appraisal for the Bridgepoint property could not be located in the institution's records. Written inquiries were sent to Northwest's directors and Mann. A response from GMAC claimed that they had reviewed a December 9, 1983 appraisal, and that they had placed a value of $4 million on the oil and gas properties. The appraisal, however, placed a $3.2 million market value on Bridgepoint. GMAC conceded that Bridgepoint was encumbered with $7.1 million in debt and that Northwest had had to pay $781,000 in accrued interest. Based on these figures, Taylor concluded that Northwest had swapped a property worth $4 million for a property with a negative worth of approximately $5 million, resulting in a loss to the institution of approximately $9 million.

An accountant and acting controller of Northwest, on instructions from Moore or Plotkin, booked Bridgepoint on Northwest's books at $18.8 million. This figure was the sum of the overstated value of the Tartan properties and the outstanding debt on Bridgepoint Northwest had assumed. Northwest had not had an appraisal done on the property prior to the swap. In 1985 FHLBB reports, Northwest reported that Bridgepoint was worth $19.18 million in March, and $19.354 million in April. The accountant testified that when she showed Moore the Eve Williams appraisal, he "threw it across the room." Audie Pete, a CPA with Ernst and Whinney, became Northeast's controller in May 1985. He was concerned about accounting for the Bridgepoint property because it was such a large part of Northwest's total assets. He asked for an appraisal on more than one occasion. Eventually he ordered an appraisal. Marcella Pardo, another MAI appraiser with First Franklin Appraisal Company, appraised the market value of the property, as of December 31, 1984, at $4.8 million.

In 1985 Mann acquired Northwest Savings from GMAC. He merged it with Equitable Savings and created CreditBanc Savings and Loan Association (CreditBanc). At first he had proposed using Northwest's own money to buy out his partner in Equitable. After this proposal was rejected, the FHLBB reluctantly accepted a later proposal, in part because the FHLBB was of the view that "Northwest is insolvent and we have no other option currently available." At the time federal takeovers of insolvent institutions were limited to those institutions that were "desperately insolvent," according to the official who reviewed the proposed merger. The merger application included a pro forma balance sheet for Northwest, Equitable and the proposed merged institution. The line item for Northwest's real estate owned reflected a value of $18-19 million for the Bridgepoint property.

17

Prior to the merger Audie Pete believed that "mark to market" accounting would be required, appraising assets as of the date of the merger. He received an oral preliminary appraisal of $5-6 million for the Bridgepoint property. He adjusted the value of Bridgepoint on Northwest's books downward by $14.8 million, an adjustment he believed "would have a very significant impact on the operations." Mann instructed Pete to cancel the appraisal. Pete then "whited-out" the $14.8 million adjustment.

In summary, a rational jury could find that GMAC and Mann swapped the Tartan properties for the Bridgepoint property in an effort to falsely inflate the reported assets of Northwest. This effort forestalled the FHLBB from declaring Northwest insolvent, allowed Mann to personally unload a property with a negative net worth for valuable oil and gas properties, and allowed for the planned transfer of Northwest to Mann. The swap also removed the oil and gas properties from the books of Jefferson, and the jury could reasonably find this swap as a further effort to delay or hinder regulatory investigation of the earlier transaction made the basis of count 1. We find the evidence sufficient on count 30.

The evidence was also sufficient to convict Moore and Mann on related counts 31 and 32. Count 31 charged that GMAC and Mann with the substantive count of misapplying Northwest's funds in connection with the land swap. A rational jury could find that Moore, as a director of Northwest, grossly misapplied the institution's funds in connection with the swap, and that Mann aided and abetted this misapplication. Count 32 alleged that GMAC, aided and abetted by Mann, made a false entry by booking the Bridgepoint property at almost $19 million. As explained above, a rational jury could conclude that this value was grossly overstated.

Appellants again argue that, under *Beuttenmuller*, the Bridgepoint swap cannot be criminal because it was a value-for-value transaction. Under *Beuttenmuller*, the property swap is considered value-for-value unless the property acquired had no value, or had "a value so low that the transaction was essentially a sham to cover the fact that" the institution was providing "the down payment money for the purchase of" the institution's real estate.[21] Again, we think the conspiracy here went far beyond a mere subterfuge to avoid regulations requiring a down payment. Further, even under the *Beuttenmuller* test, the jury could easily find that the Bridgepoint property was burdened with so much debt that it had a negative net worth.

3.      *Other Counts against Mann*

Mann challenges the sufficiency of the evidence on counts 34, 35, 36, 37, and 39. After Mann traded Bridgepoint to Northwest in exchange for the Tartan properties, he placed the latter into Trilex Energy Corporation (Trilex). Mann was chairman and sole shareholder of Trilex. Pete advised Mann that for tax reasons he needed to sell the oil and gas properties in the fiscal year ending November 1985. Mann learned that Chapman Energy Company (Chapman) was interested in buying oil and gas properties. Mann pressed Chapman to buy the properties by the end of November. The properties were sold to Chapman for $3.5 million. According to Chapman's chairman, to secure the deal, Mann promised (1) to repurchase the properties if there was a discrepancy in the quality or quantity of the properties (since Chapman had not had time to complete its due diligence), (2) to purchase one million shares of Chapman stock from Roger Chapman, and (3) to provide Chapman with a $20 million line of credit from CreditBanc. The

---

[21] *Beuttenmuller*, 29 F.3d at 980.

Chapman chairman described the line of credit as "important to us as part of the whole deal," and "an integral part of" the deal.

Mann was convicted on count 34, alleging that he violated 18 U.S.C. § 215(a) by representing to Chapman that CreditBanc would provide $20 million in financing to Chapman and purchase Chapman stock to entice Chapman to buy Mann's oil and gas properties. Mann argues that at most there were some separate discussions about the line of credit and stock purchase unrelated to the Trilex sale, and that in any event the discussions went nowhere. However, a bank officer of a federally insured institution violates § 215 if he "endeavored to procure or procured" a loan from the institution for another in exchange for something of value from that other.[22] We conclude that the evidence is sufficient on this count.

In March 1986, Mann sold one of his companies, T-L Drilling, to Mirlex Corporation for a $2.5 million note payable to the parent of T-L Drilling, Trilex, in which Mann was sole shareholder, and Mirlex's assumption of $1 million of T-L Drilling debt. The note was later distributed to Mann as a dividend. Mann was convicted on counts 35 and 36, alleging that Mann violated 18 U.S.C. § 215(a) and 18 U.S.C. § 1006, by securing the sale of T-L Drilling and the note in exchange for causing CreditBanc to make a $250,000 loan to Jack Curtsinger, one of Mirlex's principals, and representing that CreditBanc would fund real estate acquisition loans to Curtsinger. The evidence established that CreditBanc made a $250,000 loan to Curtsinger on the same day that Trilex received the $2.5 million note from Mirlex. Curtsinger testified that the loan was working capital needed to "keep the doors open" at T-L Drilling, and that the loan was made "in relation to" the purchase of T-L Drilling. He testified that Mann told him CreditBanc would

---

[22] *United States v. Jumper*, 838 F.2d 755, 757 (5th Cir. 1988).

consider financing Mirlex's real estate investments, but no such investments were ever financed by CreditBanc. We find the evidence sufficient on count 35, since a rational jury could conclude that Mann both procured and endeavored to procure loans from CreditBanc to Curtsinger in exchange for Mirlex's purchase of T-L Drilling. This same evidence also supports Mann's conviction on count 36, alleging a violation of 18 U.S.C. § 1006.[23]

Mann was convicted on count 37, alleging that he violated by 18 U.S.C. § 7206 by claiming a fraudulently large loss on the 1985 corporate tax return of Trilex. A loss of $4.2 million was the claimed loss on Trilex's sale of the oil and gas properties to Chapman. This loss offset Trilex's substantial taxable gains realized from the Bridgepoint swap. The government offered evidence that the sale to Chapman did not close until after the end of tax year 1985, and that Mann fraudulently moved this loss to the prior tax year to avoid taxes. We find the evidence sufficient on this count.

Mann was convicted on count 39, alleging that he understated his income on his 1986 income tax return, in violation of 26 U.S.C. § 7206. Mann had borrowed millions of dollars from Trilex. The government claims that Trilex was liquidated, in which case the amount due on the loan as well as all assets distributed to Mann count as income to him. Mann does not dispute this theory legally,[24] but claims that Trilex Corporation was not liquidated but was merged into

---

[23] "In order to convict a defendant of improper participation in bank transactions under section 1006, the government must demonstrate: (1) the defendant's connection with the protected institution; (2) direct or indirect receipt of some benefit from a bank transaction; and (3) intent to defraud." *United States v. Pettigrew*, 77 F.3d 1500, 1522 (5th Cir. 1996) (internal quotation marks omitted).

[24] To us, it makes sense that when a lender simply ceases to exist, and there is no evidence that a liquidator, trustee or other successor in interest intends to seek payment on the loan, the loan becomes forgiven in its entirety. A discharge of indebtedness is a form of taxable income.

21

another company. The government offered evidence that Trilex was in fact liquidated, including a written liquidation plan, adopted by the company and calling for the complete liquidation of the company and distribution of all assets to the sole shareholder, Mann, and evidence that the Mirlex note held by Trilex had been dividended to Mann. In January of 1987 the Texas Secretary of State declared the corporate charter of Trilex forfeited, after receiving notification from the state Comptroller that Trilex had failed to file a franchise tax report. The government further argues that even if Trilex was not liquidated, Mann still committed tax fraud because Mann caused Trilex to dividend to him the $2.5 million Mirlex note, discussed above, and he did not report that dividend as taxable income.[25] Under either theory we find the evidence sufficient on this count.

B.    *Limitations*

Mann and Moore argue that the count 1 conspiracy count was barred by limitations, and that allowing evidence on this time-barred count prejudiced the jury's consideration of the other counts. The limitations period runs from the last overt act of the conspiracy alleged in the indictment and proved at trial.[26]

---

26 U.S.C. § 61(12). Mann's tax preparer, Christine Spencer, a CPA, testified that if Trilex went out of business, the loan became taxable income to Mann because "[h]e's not going to owe anyone . . . . [H]e received the benefit of the funds and did not pay taxes, nor did the corporation pay tax on it." Audie Pete also wrote a memo opining that the planned liquidation of Trilex would result in a taxable gain to Mann of approximately $10 million.

[25] Spencer testified that the transfer of the Mirlex note from Trilex to Mann would only increase the amount of the loan from Trilex to Mann, but we think a jury could conclude otherwise. The government produced an assignment of promissory note filed in the courthouse records, stating that Trilex distributed the note to Mann "as a dividend paid from Trilex to Mann." We can locate no documentation supporting Spencer's view that the assignment was treated as an increase in the loan.

[26] *Grunewald v. United States*, 353 U.S. 391, 396 (1957).

As explained above, count 1 alleged a conspiracy (1) to defraud the United States by impairing the functions of the FHLBB, (2) to violate 18 U.S.C. § 657 (misapplication of bank funds); (3) to violate 18 U.S.C. § 1006 (false entry in bank records); (4) to defraud the United States by impeding the lawful governmental functions of the Internal Revenue Service; and (5) to file false income tax returns in violation of 26 U.S.C. § 7206.

Three different limitations periods apply to count 1. The general criminal limitations statute of five years applies to the first object.[27] The fourth and fifth objects, alleging a conspiracy to commit tax fraud and to defraud the IRS, are subject to a six-year limitations period.[28] Conspiracies to violate §§ 657 or 1006 are governed by a ten-year limitations period, 18 U.S.C. § 3293, but this statute applies to offenses occurring prior to its passage only if the previous limitations period (5 years) had not run on the date of enactment of the statute, August 9, 1989.[29] The indictment issued on June 30, 1993. So to fall within the applicable limitations periods, the last act in furtherance of a conspiracy to impede the FHLBB had to occur after June 30, 1988, the last act in furtherance of a conspiracy to impede the IRS or violate the tax laws had to occur after June 30, 1987, and the last act in furtherance of a conspiracy to violate §§ 657 and 1006 had to occur after August 9, 1984.

Moore argues that if any one of the alleged objectives of the conspiracy is barred by limitations, the conviction on count 1 must be reversed. We cannot agree. If any one of the five

---

[27] 18 U.S.C. § 3282.

[28] 26 U.S.C. § 6531.

[29] Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 961(*l*)(3), 1989 U.S.C.C.A.N. (103 Stat.) 183, 501 (1989), *reprinted in* 18 U.S.C.A. § 3293 (West Supp. 1998) (Historical and Statutory Notes).

alleged violations was proven, then the government proved a violation of § 371. "The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."[30] Moore relies on *Yates v. United States*.[31] In *Yates*, the defendant was convicted on a conspiracy count alleging two objectives. The Court held that one of the objectives was barred by limitations, and that the conviction therefore required reversal, since "it is impossible to tell which ground the jury selected."[32]

However, in *Griffin v. United States*[33] the Court restricted the holding of *Yates* to cases where one of the alleged objects of the conspiracy is *legally* defective. "Legal error" is not insufficiency of evidence, but "means a mistake about the law, as opposed to a mistake concerning the weight or factual import of the evidence."[34] In cases where the evidence of one of the alleged objectives of the conspiracy is factually insufficient, the Court in *Griffin* held that the verdict should stand so long as there is sufficient evidence on another alleged object of the conspiracy.[35] Moore does not demonstrate that one of the alleged objects of the conspiracy was "legally

---

[30] *Turner v. United States*, 396 U.S. 398, 420 (1970).

[31] 354 U.S. 298 (1957).

[32] *Id.* at 312.

[33] 502 U.S. 46 (1991).

[34] *Id*. at 59.

[35] *Id*. at 56-60. *Accord United States v. Wilson*, 116 F.3d 1066, 1080 (5th Cir. 1997) (discussing *Yates* and *Griffin*), *cert. denied*, 118 S. Ct. 703-04 (1998).

defective," in the *Griffin* sense; he argues only that there was insufficient evidence of acts committed within the limitations period as to some of the alleged objects of the conspiracy.

Moore alternatively argues that the government failed to prove any act in furtherance of any objective of the conspiracy within the applicable limitations period. We agree with the government that there was sufficient evidence of numerous overt acts in furtherance of the alleged conspiracy occurring within the limitations periods. There was evidence that in 1987, 1988, 1989 and 1990, Moore caused the filing of corporate tax returns for PSDC, showing a $4 million "loan" from stockholders. A rational jury could find that this loan, discussed further above, was a sham, and that the tax filings allowed the GMAC partners to avoid taxes and conceal the fact that Mann and GMAC had used Jefferson's own funds to acquire Jefferson.[36] A rational jury could find that these filings were acts in furtherance of concealing the first, fourth and fifth objects of the conspiracy.[37] As to the third object of the conspiracy – the making of false

_____

[36] Mann argues that the jury could not have found the 1989 and 1990 tax filings to be in furtherance of the conspiracy, because the jury acquitted Moore on counts 28 and 29, the substantive counts for filing a false tax return. The verdict is not necessarily inconsistent in this regard. The jury might have found that the later filings were not "material" since they simply restated past filings. While materiality is an element for tax fraud, *see* 26 U.S.C. § 7206(1), there is no requirement that an act in furtherance of a conspiracy must be "material." More likely, the jury simply decided that convicting Moore on two counts relating to the PSDC tax return (counts 26 and 27) was sufficient, and that additional convictions would amount to overkill. Even if the verdict is inconsistent, the conviction on count 1 should stand, as long as the evidence is sufficient to support a conviction on that count. *United States v. Powell*, 469 U.S. 57, 67-69 (1984). Given "the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity . . . the best course to take is simply to insulate jury verdicts from review on this ground." *Id*. at 68-69.

[37] Moore argues that the tax filings could not have furthered the first object of the conspiracy – impeding the lawful governmental functions of the FHLBB in the regulation, supervision, and examination of the affairs of Jefferson Savings – because there was no evidence that the FHLBB and the IRS shared information. However, in the course of the 1985 IRS examination of GMAC and their companies, agent Burns requested "documents that the GMAC

records and reports of Jefferson – there was evidence that Northwest continued to overstate the value of the Tartan properties to the FHLBB until the time of the swap of these properties for the Bridgepoint Residential property in late 1984. A rational jury could find that these filings were in furtherance of the conspiracy to make false statements. Moore argues that filings with the FHLBB in 1984 could not have related to Jefferson, since Jefferson did not even exist at the time. However, Jefferson's successor entity, Northwest, continued to operate after Jefferson was merged into Northwest. Examination of the affairs of Jefferson by the FHLBB, including examinations that might, and did, lead to the pursuit of criminal sanctions, did not end with the merger.[38]

---

group filed with any regulatory agency regarding the acquisition of Jefferson Savings and Loan," and received some documents. A dispute with the IRS over the treatment of the "loan" became a matter of public record when the GMAC partners filed a tax court action in 1988. A rational jury could find that Moore and Mann, from the outset, recognized that the means employed to acquire Jefferson required concealment from and misrepresentations to the IRS as well as the FHLBB. Moore also argues that all efforts to impede the IRS ended in April 1987, when Mann disclosed key aspects of the acquisition of Jefferson to IRS agent Burns. According to Burns, Mann disclosed that he had received a $1 million fee as agent or broker for the sale of the Tartan properties to Jefferson, that via the $4 million loan from Camco to PSDC, "the funds had been loaned or transferred to [GMAC]," and that the PSDC note had been repurchased by Alsup and Christensen at a discount. This testimony does not establish that all efforts by the conspirators ceased after these disclosures. First, Mann continued to characterize the $4 million transfer to GMAC as a "loan." Second, the jury could find that later efforts by the conspirators, including the filing of the PSDC tax returns, and the prosecution of the tax court action, were efforts to impede the IRS.

[38] Regarding the second object of the alleged conspiracy – misapplication of Jefferson's funds – the government conceded to the jury and the district judge that limitations had run on the original misapplication of Jefferson's funds in the purchase of the Tartan properties. However, it argues on appeal that later "misapplications occurred when the conspirators, on a month by month basis, caused and approved the payment of interest necessary to carry the oil and gas properties in Jefferson's asset portfolio at the inflated $13 million-plus value." It made a similar argument to the district court. Without deciding the merit of this argument, we hold that limitations had not run on the other objects of the conspiracy.

Relying on *Grunewald v. United States*,[39] Mann and Moore argue that the overt acts on which the government relied were at most acts to conceal an already completed conspiracy, and that such acts are not acts in furtherance of the conspiracy for limitations purposes. The conspiracy count in *Grunewald* concerned efforts by the defendants to obtain "no prosecution" rulings in two tax cases by bribing an IRS official. The Court reversed the conspiracy conviction on limitations grounds, reasoning that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment."[40] The Court's concern was that holding otherwise "would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators."[41] Appellants argue that under *Grunewald* all of the alleged acts in furtherance of the conspiracy within the limitations periods were no more than efforts to conceal the alleged central purpose of the conspiracy – the 1982-83 purchase of the oil and gas properties and takeover of Jefferson by GMAC.

We cannot agree with appellants that the count 1 conspiracy convictions must be reversed under *Grunewald*. As quoted above, the Court held that the limitations period runs where, after the "central criminal purposes of a conspiracy have been attained," the only acts occurring within the limitations period are acts of concealment from which a "subsidiary conspiracy to conceal may

---

[39] 353 U.S. 391 (1957).

[40] *Id*. at 401-02.

[41] *Id.* at 402.

not be implied." *Grunewald* recognized, however, that "a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained."[42] It recognized that in some cases "the successful accomplishment of the crime necessitates concealment."[43] Later cases have recognized that acts of concealment are in furtherance of the conspiracy for limitations purposes where the nature of the conspiracy is such that concealment is part of or in furtherance of the main objectives of the conspiracy. We have recognized that acts of concealment are "part of the central conspiracy itself" where "the purpose of the main conspiracy . . . by its very nature, called for concealment."[44] "[C]oncealment is sometimes a necessary part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy."[45] In *Forman v. United States*,[46] the Court held that an indictment alleged and the evidence supported a conspiracy to evade taxes extending from 1942 to 1953, even though the last fraudulent return was for 1945, because concealment had to continue if the evasion was to succeed.[47]

In the pending case, the count 1 conspiracy was not limited to a conspiracy to misapply the assets of Jefferson, and obtain control of Jefferson through that fraudulent transaction. The

---

[42] *Id.* at 405.

[43] *Id.*

[44] *United States v. Diez*, 515 F.2d 892, 897-98 (5th Cir. 1975).

[45] *United States v. Del Valle*, 587 F.2d 699, 704 (5th Cir. 1979).

[46] 361 U.S. 416 (1960).

[47] *Id.* at 423-24.

central aim of the conspiracy extended to concealing the fraudulent nature of the transaction, in order to evade taxes and maintain control of the institution in the face of continual regulatory oversight. Frustration of investigatory efforts by the FHLBB and the IRS in a highly regulated environment was central to the conspiracy. The evidence supported a conspiracy, as alleged in the indictment, not only to defraud Jefferson and obtain control of the institution, but "to hide and keep concealed from the [FHLBB] the true facts and circumstances surrounding the acquisition, financing, operation, and management of Jefferson Savings;" "to hinder and defeat the [IRS] in the ascertainment, assessment, collection, and payment of income tax on the $4.2 million fraudulently obtained from Jefferson Savings;" and "to defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the [FHLBB] in the regulation, supervision, and examination of the affairs of Jefferson Savings."

Mann argues that, irrespective of evidence of overt acts in furtherance of the conspiracy committed by others, *his* participation in the conspiracy ended no later than September 1983, when he sold the PSDC note to Alsup and Christensen and received, in the government's words, his $1 million "payoff" for his efforts to transfer control and ownership of Jefferson to GMAC. We cannot agree that Mann's role in the conspiracy ended on this date. Ordinarily, a defendant is presumed to continue his involvement in a conspiracy unless he makes a substantial affirmative showing of "'withdrawal, abandonment, or defeat of the conspiratorial purpose.' . . . Indeed, '[a] member of a conspiracy continues to be responsible for acts committed by coconspirators even after the former's arrest unless he has withdrawn from the conspiracy.'"[48] To demonstrate

---

[48] *United States v. Puig-Infante*, 19 F.3d 929, 945 (5th Cir. 1994) (quoting *United States v. Branch*, 850 F.2d 1080, 1082 (5th Cir. 1988) and *United States v. Killian*, 639 F.2d 206, 209 (5th Cir. 1981)).

withdrawal from the conspiracy, the defendant must show that he has committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators.[49]  Mann does not meet this burden.

C.    *Bruton Claims*

Mann complains that under *Bruton v. United States*,[50] the court reversibly erred when it failed to sever Mann from the trial after allowing the government to introduce prior testimony of Moore that conflicted with prior testimony of Mann that was also read to the jury.  This claim is based on testimony given by Mann and Moore to the FHLBB.  Mann testified that he dealt exclusively with Moore in connection with the Jefferson's acquisition of the Tartan properties. Moore, on the other hand, was asked whether he was "aware of a purchase by Mr. Mann's companies from a company called Tartan Exploration of the oil and gas properties which were then later sold to Jefferson."  Moore testified that "I have seen that name subsequent to our acquisition of Jefferson.  I was not familiar with that prior to that point in time."  In other testimony read to the jury, Moore denied knowing that Mann had purchased the properties for less than he was selling them to Jefferson.

Mann does not show a *Bruton* violation.  *Bruton* is inapplicable unless the codefendant's out-of-court statement "directly incriminates the non-confessing defendant without reference to other,  admissible evidence."[51]  Moore's statement that he was not familiar with a purchase of the Tartan properties by Mann prior to Jefferson's purchase of the properties did not directly

---

[49] *Id*.

[50] 391 U.S. 123 (1968).

[51] *United States v. Espinoza-Seanez*, 862 F.2d 526, 534 (5th Cir. 1988).

30

incriminate Mann.  That testimony tends to exculpate both of them from the charge that they conspired to have Jefferson purchase the Tartan properties from Mann at an inflated price, and to use the profits to allow GMAC to acquire Jefferson.

Moore complains that *Bruton* was violated when the court allowed the government to introduce deposition testimony of Mann.  In particular, Moore complains of excerpts of a deposition Mann gave in a civil suit brought by the FDIC against a law firm, Mann and GMAC. In that deposition, Mann testified that (1) he purchased the Tartan properties for $4 million less than he sold them to Jefferson, (2) he negotiated the price Jefferson paid with Moore, and (3) Moore was aware of the price Mann had paid for the properties.

*Bruton* issues are reviewed under an abuse of discretion standard.[52]  A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence.[53]  We find no abuse of discretion.  Assuming that Mann's out-of-court statements directly incriminated Moore without reference to other admissible evidence, thus implicating *Bruton*, "*Bruton* has been limited . . . to cases where the admission of the incriminating statements was not within a firmly rooted exception to the hearsay rule."[54]  The district court reasoned that Mann's testimony was admissible as an admission of a party under FED. R. EVID. 801(d)(2), or as former testimony under FED. R. EVID. 804(b)(1).  We cannot say that the district court erred,

---

[52] *United States v. Beaumont*, 972 F.2d 91, 94 (5th Cir. 1992).

[53] *Esmark Apparel, Inc. v. James*, 10 F.3d 1156, 1163 (5th Cir. 1994).

[54] *United States v. Saks*, 964 F.2d 1514, 1525 (5th Cir. 1992).

31

legally or factually, in concluding that the testimony was admissible under Rule 804(b)(1).[55] This

rule provides a hearsay exception where the declarant is unavailable[56] and the evidence consists of

deposition testimony in another proceeding, provided that "the party against whom the testimony

is now offered . . . had an opportunity and similar motive to develop the testimony by direct,

cross, or redirect examination." As a legal matter, we hold that Rule 804(b)(1) is a firmly rooted

exception to the hearsay rule.[57] As for the factual predicate of opportunity and motive to develop

the prior testimony, the district court reasoned:

> This is . . . testimony given by . . . Mr. Mann in a lawsuit where they are both
> represented, wherein the FDIC is attempting to recover its losses against the
> lawyers that represented. We've referred to it as Jones Day, but Mr. Mann, Mr.
> Moore, Mr. Gallaher, Mr. Christensen, Mr. Alsup were all parties there
> represented, and the main thrust of that lawsuit was obviously for the FDIC to
> obtain money from the conduct involving Jefferson Savings, Jefferson Energy,
> Northwest, Franklin and City Bank.

The court referred to the testimony as "testimony in a proceeding whereby the issues were

generally the same." Moore does not show that this factual premise for admission was clearly

erroneous. If Moore was a party to the prior suit, and it involved similar claims, we cannot say

that the district court erred in ruling the testimony admissible under Rule 804(b)(1). Moore

---

[55] As the district court recognized, the testimony of Mann was not admissible against
Moore as an admission, since an admission, by definition, is a statement offered against a party
that is "the party's own statement." FED. R. EVID. 801(d)(2)(A). *See Bruton*, 391 U.S. at 128
n.3.

[56] Mann was "unavailable" because he invoked his Fifth Amendment privilege against self-
incrimination.

[57] *See Mancusi v. Stubbs*, 408 U.S. 204, 213 (1972) (noting that at least since *Mattox v.
United States*, 156 U.S. 237 (1895), "prior-recorded testimony has been admissible in appropriate
cases"); *United States v. Kelly*, 892 F.2d 255, 262 (3d Cir. 1989) (holding that Rule 804(b)(1)
"former testimony exception is firmly rooted in our jurisprudence"); *United States v. Salim*, 855
F.2d 944, 954-55 (2d Cir. 1988) (same).

argues that he was not present at the deposition, but as a party to the suit he certainly had an opportunity to attend. He also argues that the deposition was a mere discovery deposition, and he did not necessarily have a motive to cross-examine Mann at that time. Rule 804(b)(1), however, does not require that the party against whom the prior testimony is offered had a compelling tactical or strategic incentive to subject the testimony to cross-examination, only that an opportunity and similar motive to develop the testimony existed.

D.     *Joinder and Severance Issues*

Mann and Moore complain that counts 1 and 30, two "disparate" conspiracy counts, should not have been joined in the same indictment. They argue that in this multi-defendant case the two alleged conspiracies were not sufficiently related to constitute a "series" of acts or transactions required for joinder under FED. R. CRIM. P. 8(b). However, appellants failed to move for a severance of counts 1 and 30 prior to trial.[58] Under FED. R. CRIM. P. 12(b), "objections based on defects in the indictment," as well as "[r]equests for severance of charges or defendants under Rule 14," must be raised prior to trial. "Failure by a party to . . . make requests which must be made prior to trial . . . shall constitute waiver thereof, but the court for cause shown may grant

---

[58] Appellants point out that defendants Gallaher and Christensen filed motions for severance. While Christensen's motion pointed out that the indictment "alleges two distinct conspiracies," neither of these motions was for severance of counts 1 and 30. They were instead motions to sever the movants from the other defendants, and to require separate trials for each of the movants. Even if another defendant had moved to sever counts 1 and 30, appellants do not show that they joined in such motion, or that the district court allowed one defendant to adopt motions filed by other defendants. The district court in fact denied a motion by Gallaher to adopt motions of other defendants, and a motion by Mann to incorporate and adopt Moore's objections to the presentence report. Moore did file a motion "for relief from prejudicial joinder," but the basis of this motion was that count 1 should be dismissed and redrafted because it joined five alleged criminal objectives of the conspiracy, with differing limitations periods. Moore never moved to sever counts 1 and 30.

relief from the waiver."[59]  We have held that where, as here, appellants have failed to show any cause for failing to move for severance prior to trial, we need not even address the merits of their argument.[60]  Alternatively, we have limited review to plain error review in such circumstances.[61]  Under that exacting standard, appellants have failed to establish a clear or obvious error, which affected their substantial rights, and which would seriously affect the fairness, integrity or public reputation of judicial proceedings if allowed to stand.[62]

Moore argues that the district court should have severed counts 33-39, which pertained solely to Mann.  He filed a motion to sever these counts, arguing that they had no relation to the allegations against him and that "combining Mann's alleged criminal conduct with that alleged against Moore would seriously prejudice Moore in the defense of this case."  On appeal he argues that inclusion of these counts amounted to misjoinder under Rule 8(b).

In reviewing the denial of a motion to sever, "[e]ven if it is determined that initial joinder was improper, in order to demonstrate reversible error, [appellant] must still show clear, specific and compelling prejudice."[63]  Moore has failed to make such a showing, for several reasons.  First,

---

[59] FED. R. CRIM. P. 12(f).

[60] *United States v. Tolliver*, 61 F.3d 1189, 1198-99 (5th Cir. 1995), *vacated and remanded on other grounds*, 516 U.S. 1105 (1996).

[61] *Tolliver* notes that a failure to move for severance prior to trial might leave room for review under the plain error standard of review, *id*. at 1199 n.6, and other cases have reviewed the district court's failure to sever for plain error where there was no objection.  *United States v. Misher*, 99 F.3d 664, 669 (5th Cir. 1996); *United States v. Carreon*, 11 F.3d 1225, 1240 (5th Cir. 1994).

[62] *See United States v. Clements*, 73 F.3d 1330, 1337 (5th Cir. 1996).

[63] *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995).

the evidence against Mann on counts 33-39 represented a relatively small part of the trial.

Second, we have no basis for concluding that the jury became prejudiced against Moore as a result of the evidence against Mann on these counts. The court instructed the jury to "[r]emember that you must give separate and independent consideration of the evidence as it applies to each defendant and each count in the indictment. The fact that you may find one defendant guilty or not guilty of any of the offenses charged should not control your verdict as to any other defendant." We have held similar instructions sufficient to cure any possible prejudice from the joinder of defendants.[64] Further, the acquittal of all the defendants on one or more counts[65] "supports the inference that the jury considered separately the evidence as to each defendant and each count."[66] Finally, we note that Moore's own pleadings below suggest that a joint trial with the other defendants offered a benefit to offset the prejudice about which he now complains on appeal. When, shortly before trial, the government moved to sever codefendant Gallaher because his counsel had suffered a broken leg, Moore's counsel objected, arguing that the motion for severance, "if granted, will eliminate thirty-three percent (33%) of the assistance that the undersigned had counted upon (i.e., assistance from [counsel for Christensen, Mann and Gallaher]). The undersigned is fearful that a severance of Defendant Gallaher will render the undersigned ineffective due to that decreased assistance, prior to and during the trial."

---

[64] See *United States v. Faulkner*, 17 F.3d 745, 759 (5th Cir. 1995), and cases cited therein.

[65] Christensen was acquitted on all fifteen counts against him, Mann was acquitted on count 33, and Moore was acquitted on counts 7, 8, 11, 14, 17, 21, 24, 28 and 29.

[66] *Id.*; *see also United States v. Pettigrew*, 77 F.3d 1500, 1517 (5th Cir. 1996).

Mann argues that the court should have severed Mann from the trial after the government read conflicting prior testimony of Mann and Moore. Mann argues that severance was required under *Bruton*, and because Mann's and Moore's defenses were prejudicially antagonistic. As explained above, we find no *Bruton* violation. As for the claim that appellants' defenses became prejudicially antagonistic after the admission of the conflicting prior testimony, the Supreme Court has held that severance is not automatically required when codefendants present mutually antagonistic defenses.[67] Severance in such circumstances is left to the district court's sound discretion.[68] To demonstrate an abuse of discretion in denying a motion to sever, the defendant "bears the burden of showing specific and compelling prejudice that resulted in an unfair trial,"[69] and such prejudice must be of a type "against which the trial court was unable to afford protection."[70]

There was no abuse of discretion. The court afforded protection against prejudice by instructing the jury to consider separately the evidence against each defendant, and the jury demonstrated this ability by acquitting all the defendants on one or more counts, as explained above. We have held that where defendants present antagonistic defenses, instructions to consider the evidence as to each defendant separately and individually, and not to consider comments made by counsel as substantive evidence sufficed "to cure any prejudice caused when

---

[67] *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993).

[68] *Id*. at 541.

[69] *United States v. Holloway,* 1 F.3d 307, 311 (5th Cir. 1993).

[70] *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir. 1989).

36

co-defendants accuse each other of the crime."[71]  The trial court gave such instructions.  Further, we are not persuaded that Mann and Moore in fact had mutually antagonistic defenses.  As to both defendants, the main thrust of the defense was essentially the same – that the defendants had not conspired to defraud the lending institutions or government agencies, that the transactions at the core of the government's case were legitimate business transactions, and that the defendant's conduct and decisions should not be judged with hindsight knowledge of the financial results. The mere fact that Mann and Moore made conflicting statements in their depositions did not render their defenses mutually antagonistic.

E.     *Question from Jury*

Moore complains that the district court reversibly erred by failing to answer fully and accurately a question from the jury.  After deliberations began, the jury sent a note stating: "Legal Question: Is it true that, in 1982-84, the FHLBB required 'as is' appraisals to back up values of property on their books?"  There followed a colloquy among the judge and attorneys. Government counsel was of the view that the correct answer to the question was "yes," but later qualified that answer by opining that appraisals were not required when the savings institution made a "direct investment" in real estate (versus making a loan to a purchaser of the real estate). Counsel for Mann suggested that the jury be advised that there was no requirement of an appraisal for direct investments.  Counsel for Moore and Christensen asked that the court answer the question "no."  The court was of the view that the FHLBB had the authority to require "as is" appraisals, but "[t]he problem in this case is they never got enough information to intelligently request it."  Ultimately, the court instructed the jury: "You must render a verdict based on the

_____

[71] *United States v. Stouffer*, 986 F.2d 916, 924 (5th Cir. 1993).

37

evidence presented in trial and the legal instructions previously given you in oral and written form."

Moore objected to this answer, and argues on appeal that the answer was inadequate and that the court should have either answered the question "no" or explained to the jury that "as is" appraisals were not required for direct investments. Moore argues that the only two investments in issue in the 1982-84 time frame referenced in the jury's question were direct investments by Jefferson in the Tartan properties, and Northwest in the Bridgepoint property. There was extensive testimony at trial regarding appraisals, particularly with respect to the Bridgepoint property, the acquisition of which was the key event alleged in the count 30 conspiracy count. There was some testimony about "as is" versus "as developed" appraisals. Moore points to a post-verdict letter to the court from the jury foreman, who states that he believed the question related to counts 30, 31, and 32, and that jurors were left to "just use their intuition" given the court's answer.[72]

A trial judge enjoys wide latitude in deciding how to respond to a question from the jury.[73] "When evaluating the adequacy of supplemental jury instructions, we ask whether the court's

---

[72] The letter states in pertinent part: "Regarding the deliberations, the convictions on the counts involving 'as-is' appraisals needs to be addressed. I believe these were counts 30, 31, and 32. During the deliberations, I requested an interpretation of the law in the mid-1980's pertaining to appraisals. We needed to know if the law required that federally insured institutions were required to use 'as-is' appraisals when evaluating their assets. The reply stated that the evidence was in the case. Not one juror could find any concrete statement that a future value could not be used, which is why we asked for the interpretation. Many jurors were left to 'just use their intuition.' No expert ever testified, just a variety of opinions were given. It would have been helpful to know if future value appraisals were acceptable in the mid-1980's, as I believe that the convictions on these counts primarily revolved around the lack of interpretation of this law."

[73] *United States v. Stevens*, 38 F.3d 167, 170 (5th Cir. 1994).

answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it."[74]

We see no error in the court's answer to the jury's question. The answer properly urged the jurors to refocus on the written charge, rather than to concern themselves with whether federal regulations required "as is" appraisals. The charge clearly instructed the jury that it must find intentionally fraudulent or deceitful acts made the basis of the counts in the indictment before it could convict. It drove this point home by explaining to the jury that (1) a mere violation of a federal regulation is not criminal, absent a finding of the requisite intent to defraud or deceive,[75] (2) the good faith of a defendant is a complete defense to the charges,[76] and (3) a belief honestly held but which turns out to be inaccurate, or an honest mistake in judgment, is not criminal.[77]

The letter from the juror does not alter our conclusion. The letter indicates that an answer to the question "would have been helpful." We do not read it to claim that the jury reached the

---

[74] *Id.*

[75] The charge stated: "The issue in this case is whether the defendants are guilty of violating federal criminal statutes specifically alleged in the indictment, not whether the defendant violated a civil law or regulations, regardless of whether such a violation occurred. The testimony which you have heard about the Texas and federal civil statutes and regulations may be considered only because it may be necessary to your understanding of the background of this case, and to your understanding of the reasons or motives for the various transactions."

[76] The charge stated: "The good faith of a defendant is a complete defense to the charges contained in this indictment; good faith on the part of a defendant is simply inconsistent with the intent to defraud or deceive, which is involved in every count. While the term 'good faith' has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another."

[77] The charge stated: "A person who acts, or causes another person to act, on a belief or opinion honestly held is not punishable under the criminal law merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or an honest error in management does not rise to the level of intent to defraud."

wrong verdict because of the court's answer.  Moreover, "[o]utside of the narrow exception that arises when there is evidence of outside influences on a jury, a court should adhere to the common-law rule against admitting juror testimony to impeach a verdict."[78]

F.      *Admission of Evidence*

Moore complains that the district court erred in admitting evidence that bad checks were written by Austin Management Associates, a company in which Moore and Gallaher were principals.  The government had earlier, unsuccessfully offered the evidence on grounds that it showed motive, in that Moore was "in desperate need of cash" in late 1985 and 1986.  When the government later tried to offer the evidence, it argued that the evidence was relevant to the financial condition of GMAC and contemporaneous "loan swapping" with Mann.  The government also argued that the "Gallaher Moore companies" were listed on financial disclosure forms provided to First Taylor National Bank, InterFirst Bank and regulators, which were in evidence.  The court admitted the testimony, over Moore's objection,  "on the grounds that this was on the financial statements as – and that goes to the indictments themselves."

The witness through which this evidence was offered, Plotkin, testified that Austin Management Associates was controlled by Moore, and had run up a negative bank balance of over $147,000 by writing bad checks.  Plotkin did not know which individual had written the checks, and explained that after he brought the overdraft situation to Moore's attention, Austin Management Associates received a loan from Franklin Savings, guaranteed by Moore personally, to pay the overdrafts.  On cross-examination, Plotkin agreed that Moore was not "aware of the underlying nature and magnitude of the problem" until Plotkin brought it to his attention.

---

[78] *United States v. Martinez-Moncivais*, 14 F.3d 1030, 1036 (5th Cir. 1994).

40

Moore argues that the evidence of the bad checks was irrelevant and inadmissible under FED. R. EVID. 404(b) and 403. The error, if any, in admitting the evidence does not amount to reversible error. An erroneous evidentiary ruling does not warrant reversal unless it affected a substantial right of the complaining party.[79] An error affects a defendant's substantial rights if it "'had substantial and injurious effect or influence in determining the jury's verdict.'"[80] Moore has not met this standard. The testimony concerning the overdrafts comprised only a few minutes of a trial spanning several weeks. Plotkin testified that he could not confirm that Moore personally wrote the bad checks, that Moore was not aware of the nature and magnitude of the overdraft problem until Plotkin brought it to his attention, and that once brought to his attention Moore personally guaranteed a note to resolve the problem. We further note that, to the extent the evidence was relevant to the government's claim that Moore had misrepresented his financial condition in his financial statements, Moore was acquitted on all counts alleging the submission of false personal financial statements.[81]

G.      *Denial of Requested Jury Instructions*

Moore complains that the district court reversibly erred in denying his requested jury interrogatories and instructions. "We review jury instructions to determine 'whether the court's charge as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the

---

[79] *United States v. Skipper*, 74 F.3d 608, 612 (5th Cir. 1996).

[80] *United States v. Lowery*, 135 F.3d 957, 959 (5th Cir. 1998) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

[81] Counts 7, 8, 11, 14, 17, 21, and 24.

41

principles of law applicable to the factual issues confronting them.'"[82]   Unless the defendant has demonstrated that the court's charge as submitted is erroneous, his contention that he was entitled to the particular language in his proffered instructions is meritless.[83]

Moore contends that the district court erred in denying his requested instructions and interrogatories on limitations, relating to count 1.  Under his proposed jury interrogatories, the jury was to be asked, as to each of the eleven overt acts in furtherance of the conspiracy alleged in count 1 and occurring after August 9, 1984,[84] whether the act occurred and whether it was done in furtherance of any of the five alleged illegal objects of the conspiracy, for a total of 66 questions.   The district court did not err in denying this request.  The jury was properly instructed that in order to convict on count 1 it must find an overt act committed in furtherance of the conspiracy and within the applicable limitations periods.  It was further instructed as to the different limitations periods for the five alleged objects of the conspiracy, and that it should disregard any alleged object for which it did not unanimously find an overt act committed within the applicable limitations period.  In short, the jury charge prohibited the jury from convicting on count 1 unless it unanimously found that an overt act was committed in furtherance of at least one of the objects of the conspiracy, and within the applicable limitations period.  The charge submitted was legally accurate and adequately presented appellants' limitations defense for jury consideration.

---

[82] *Stouffer*, 986 F.2d at 925 (quoting *United States v. August*, 835 F.2d 76, 77 (5th Cir. 1987)).

[83] *United States v. Davis*, 61 F.3d 291, 304-05 (5th Cir. 1995).

[84] As explained above, this is the earliest date on which an overt act in furtherance of the conspiracy could have occurred within the three limitations periods applicable to count 1.

Moore also complains that the court erred in refusing his requested jury instruction on materiality, relating to counts 26 and 27.  The court instructed the jury that "[a] statement is materially false if it is shown to be capable of influencing a decision of the institution to which it is made."  Moore does not show how the court's definition was erroneous.[85]  Further, we will not reverse unless, among other things, the requested instruction concerns an important point such that failure to give it seriously impaired the defendant's ability to effectively present a given defense.[86]  Moore does not meet this requirement.  The requested instruction, at most, gave a more fact-specific definition of materiality than the one given by the court,[87] and we cannot say that the failure to give the requested instruction impaired Moore's ability to effectively present his defense.

---

[85] The Supreme Court has noted that "a number of federal statutes criminalizing false statements to public officials use the term 'material.' . . .  The federal courts have long displayed a quite uniform understanding of the 'materiality' concept as embodied in such statutes.  The most common formulation of that understanding is that a concealment or misrepresentation is material if it has a natural tendency to influence, or was capable of influencing, the decision of' the decision-making body to which it was addressed." *Kungys v. United States*, 485 U.S.759, 769-70 (1988) (internal quotation marks and citations omitted) "'Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" *Id*. at 770 (quoting *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981)).

[86] *United States v. Rochester*, 898 F.2d 971, 978 (5th Cir. 1990).

[87] The requested instruction stated: "To be material a statement must have a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it is addressed.  In this regard, to be material, you must find from the evidence beyond a reasonable doubt as to counts 26 to 29 that the balance statement contained in the Parkway South Development Corporation tax returns for the tax years ending November 30, 1986 (count 26) [etc.] had a natural tendency to influence or be capable of influencing, the decision of the IRS in the ascertainment, computation, assessment, and collection of income tax allegedly due by Parkway South Development Corporation."

43

H.      *Cross-Appeal on Sentencing*

By cross-appeal the government complains of the sentence imposed. It argues that the district court erred by making a two-point upward adjustment to appellants' base offense level under U.S.S.G. § 3B1.1. The government contends that the district court, having found that appellants were organizers or leaders of a criminal activity involving five or more participants, was required to increase the offense level by four levels. The court imposed only a two-level increase, although the presentence reports recommended a four-level increase under this Guideline.

Guideline 3B1.1(a) calls for a foul-level increase if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Otherwise, Guideline 3B1.1(c) provides for a two-level increase for an organizer or leader. The government claims that at the sentencing hearing the district court found that there were five or more participants, and therefore erred by imposing only a two-level increase.

We agree with Mann that the district court did not find as a factual matter at the sentencing hearing that the criminal activity of appellants involved five or more participants.[88] The government argued at the sentencing hearing that Christensen, Gallaher, and Alsup were criminally involved. The court did state, in the course of its colloquy with the attorneys regarding appellants' leadership role, that "Mr. Christensen and Mr. Alsup knew what was going on. . . . But the three of them knew what was going on. . . . Mr. Brennan obviously knew. Mr. White obviously knew. Why they weren't charged – I guess the prosecution will carry that

_____

[88] We pretermit appellants' arguments that the government failed to preserve error or timely perfect its cross-appeal.

44

responsibility one way or the other. But there were five people." While the court found that persons in addition to appellants "knew what was going on," this is not a finding that there were five or more participants under the Guideline. Note 1 to the Guideline provides that "[a] participant is a person who is criminally responsible for the commission of the offense, but need not have been convicted." A finding that other persons "knew what was going on" is not a finding that these persons were criminally responsible for commission of an offense. "Willful participation is an essential element of the crime of conspiracy; mere knowledge of a conspiracy does not itself make a person a conspirator."[89]

Further, as we understand the government's argument, it does not maintain that a finding of fewer than five participants would have been clearly erroneous.[90] The government argues only that the district court did find five or more participants, and having made such a finding, it had no discretion to impose less than a four-level increase. As explained above, we agree with appellants that the district court did not make such a finding.[91]

---

[89] *United States v. D'Angelo*, 598 F.2d 1002, 1003 (5th Cir. 1979).

[90] The government states in its opening brief that it "is not challenging any factual finding of the district court as to the aggravating role designation or the number of participants."

[91] In their briefs responding to the cross-appeal, appellants argue for the first time that the district court erred in ordering restitution. As these arguments were raised neither in the district court nor appellants' opening briefs, our review is at most one for plain error. *See United States v. Green*, 46 F.3d 461, 465 n.3 (5th Cir. 1995) (issue raised for the first time in reply brief is waived). We find no plain error. The basis for appellants' challenges to the restitution ordered in the judgments is that restitution is only permitted under 18 U.S.C. § 3663, which does not cover tax offenses under Title 26. However, our reading of the sentencing hearing is that the restitution orders were based on losses calculated (and restitution recommended thereon) in the presentence reports. The losses calculated in the presentence reports were not losses associated with the tax counts. Moore argues that the order of $460,000 in restitution by him to the IRS is an order of restitution as to count 27. Assuming Moore is correct, the filing of the false tax return for PSDC alleged in count 27 was also alleged as an overt act in furtherance of the count 1 conspiracy.

AFFIRMED.[91]

_____

Count 1 is a count under Title 18, subject to restitution under § 3663.