OPINION OF THE COURT
Kristin Booth Glen, J.
This case presents a question of apparent first impression: whether the prior felony conviction of a deaf or hearing-impaired[1] defendant, obtained in the absence of a qualified sign-language interpreter, are unconstitutional for the purposes of sentencing as a second felony offender, pursuant to CPL 400.21 (subd 7).
This question must, in turn, be considered in the broader context of what special protection the criminal justice *517 system owes to a hearing-disabled defendant in order to guarantee her/his full participation in criminal proceedings and to insure compliance with the constitutional mandate of due process of law for all.
prFocedural history
The defendant, Ramon Rivera (Rivera), was arrested on August 10,1983. He was subsequently indicted by a Grand Jury for two counts of grand larceny in the third degree. The People fied a predicate felony information alleging two prior convictions: a burglary conviction obtained after trial in Passaic County, New Jersey, in 1981 (the New Jersey conviction) and a burglary and larceny conviction entered pursuant to a guilty plea in Superior Court, Erie County, in 1971 (the Erie County conviction). On March 7, 1984, the defendant pleaded guilty to the indictment while moving to contest sentencing as a second felony offender pursuant to CPL 400.21.
Defendant, who suffers from a severe hearing and speech impairment, contends that both prior convictions were obtained in violation of rights guaranteed him by the Constitution of the United States. A hearing was held pursuant to CPL 400.21 (subd 7), during which testimony was taken from the defendant (through sign-language interpreters Carl Chopinsky [Chopinsky] and Isabelle Calvacca [Calvacca] R.S.C.)[2] and from a number of other witnesses.
The process of interpretation for Rivera was itself so unusual that it requires special comment. Because Rivera has never developed a working command of American Sign Language (ASL), his attorney and original interpreter found communication with him inadequate. The latter recommended the additional assignment of Calvacca, a reverse skills certified interpreter and the conference Judge granted counsel’s motion for two interpreters. Thereafter, Chopinsky translated the courtroom’s spoken language into ASL for Calvacca, who is herself hearing *518 impaired. She, in turn, transformed the ASL into a more universal, expressive language of communication, including facial expressions and bodily gestures. The reverse process was similarly employed. It was apparent that Rivera was able to understand and communicate through these two interpreters as he asked intelligent questions and indicated when he did not understand.
FINDINGS OF FACT
The circumstances of each of Rivera’s two prior felony convictions will be discussed separately and seriatim.
A. The New Jersey Conviction
At his trial in Passaic County, Rivera was represented by one Elijah Miller, Jr. (Miller), of the Passaic County Public Defender’s office who was assisted by Maria Feliciano (Feliciano), a Spanish language interpreter employed by the court. No sign-language interpreter was present. The defendant took the stand at his trial and “testimony” was elicited through the Spanish interpreter. A transcript of this testimony was admitted into evidence.
At the hearing Feliciano testified for the People. She admitted she had no knowledge of ASL or any other means of communicating with the hearing impaired, and although she had been certified to interpret in the New Jersey court system, this certification involved a swearing-in ceremony not preceded by any special training. Feliciano testified that she remembered the case and the defendant, and specifically remembered that in a pretrial conference (of approximately one hour’s duration) Miller explained all of Rivera’s rights and the procedures to be followed at his trial, while she translated them into Spanish for the defendant. She testified further that Rivera told his story to Miller through her. The defendant, she said, expressed no dissatisfaction.
Feliciano recalled that the defendant seemed to have problems in comprehension, and at times indicated he could not hear her. At those times she stated that she gestured and raised her voice after which she believed the defendant understood her. She testified that the defendant never requested a sign-language interpreter, though she *519 conceded that the defendant’s speech was abnormal. Feliciano concluded from the fact that Rivera frequently nodded affirmatively that he had full comprehension of what was being explained to him.
Miller was also called as a witness for the People. He testified that he had met with the defendant on various occasions, and that the defendant often came to his office where they communicated through a Spanish-speaking secretary named Lucy Ortiz. Miller testified that Rivera had some difficulty communicating, but that he appeared to understand the proceeding.
The testimony of defendant and his experts directly contradicted the testimony of the People’s witnesses.
Rivera, testifying through Chopinsky and Calvacca, stated that his New Jersey attorney had seemed angry and insulting. He was under the impression that he was on trial for hitting the complaining witness with a hammer, though no such allegation was made. Significantly, he thought Miller had told him that he had no choice but to testify or be sent to jail. Moreover, Rivera was incapable of reciting, even through the two interpreters for the deaf, what kind of legal rights he had been afforded at his New Jersey trial.
Two expert witnesses were also called by the defendant. The first was Marion Granson (Granson) an audiologist who has been employed for the past eight years at Bellevue Hospital. Granson holds a Masters Degree and State license in audiology and was qualified without objection as an expert witness. She testified that she administered a series of tests in a soundproof environment to determine Rivera’s hearing level and suitability for a hearing aid. Her audiology reports and charts were admitted into evidence.
According to Granson, the defendant suffers from a bilateral, severe to profound sensori-neural hearing impairment, which, in her expert opinion, renders him incapable of understanding normal speech. Granson also tested Rivera’s involuntary muscular responses to sound and found no responses. She stated that this was consistent with her other test results and further testified that the involuntary response tests cannot be feigned in any way by *520 the patient, because the musculature involved is not subject to conscious control. These tests form the basis for her diagnosis. She concluded that speech loud enough to be understood by the defendant, if any, would cause severe discomfort to others in the room. In fact, her own testing equipment does not produce sound sufficiently loud to test whether there is any level at which Rivera can discriminate speech sounds.
In expressing an opinion as to Rivera’s condition at the time of the New Jersey trial, Granson relied on several facts. First, she explained that hearing loss in the inner portion of the cochlia is irreversible and cannot be corrected by surgery. Sensori-neural impairment is a condition which does not improve, but stays the same, or deteriorates. Since she was able to ascertain that Rivera’s condition in 1959, when he was a student at P.S. 47[3] was similar to his condition on the date she examined him,[4] she concluded that he was deaf in 1982 and physically unable to understand sentences or even to distinguish words at the time he was tried and convicted in New Jersey.
The defendant also called Dr. Nancy Frishberg (Dr. Frishberg), who was qualified without objection as an expert on sign-language interpretation and the psycholinguistic implications of problems related to the art of interpretation generally. Dr. Frishberg testified that in stress situations, hearing-impaired persons may attempt to diffuse perceived hostility by assuming an acquiescent emotional posture. This often takes the form of nodding affirmatively in response to a question that the person does not understand. This phenomenon, she explained, has been long known and discussed in detail in the relevant literature. Dr. Frishberg also described the phenomenon of “par *521 enting” in which an interpreter assumes a benevolent but improper role of filling in and relating language as the interpreter believes is in the person’s best interest. Sign-language interpreters, whose certification requirements are elaborate and require years of training, are aware of this phenomenon and are specifically trained to be wary of it.
When asked about the possibility of Rivera understanding court proceedings through lip-reading, Dr. Frishberg stated that under the best possible circumstances the confidence level of a person with training would be somewhere between 30% and 50%.[5] She also stated that there was no necessary relationship between the ability to speak and the ability to lip-read, and that it is more difficult to lipread when the speaker is not trained to cooperate consciously with the hearing-impaired person.[6]
Dr. Frishberg was asked to examine portions of the transcript of Rivera’s “testimony”. She found them consistent with the parenting and acquiescent phenomena she had described. In an attempt to reconcile the apparent discrepancy between Feliciano’s and Rivera’s accounts of the New Jersey trial, she explained that interpreters who lack experience with the hearing impaired will often “fill in” the gaps in what they have understood from the defendant in order to create coherency. Moreover, they lack the ability to pick up on cues that the person for whom they are interpreting does not understand them. This explanation, together with Rivera’s habit of gutturalizing some words, as he communicated through the interpreters during the hearing, explain the existence of a transcript despite Rivera’s unquestionable inability to hear any of the proceedings.
*522 Having fully considered the testimony and qualifications of the witnesses, I find that each one, with the exception of Rivera, who is by law an interested witness, was completely neutral and forthright. There is no question of credibility and thus it is necessary to resolve the apparent conflict in their testimonies.
I conclude that Rivera is now, and has been since the age of 13, so severely hearing impaired that he is and has been incapable of discerning spoken language. He is additionally incapable of adequately expressing himself without the aid of qualified interpreters.[7] Finally, he cannot read, write or lip-read in either English or Spanish, the latter being the language he spoke and understood prior to his loss of hearing.
While I believe that Miller and Feliciano genuinely thought they were adequately communicating with Rivera, in fact they were not. As Dr. Frishberg’s testimony demonstrates, the potential for misunderstanding a hearing-impaired person is enormous. This is especially true in view of the tendency of such persons to diffuse perceived hostility by nodding. (See Myers, The Law and the Deaf [1964], p 29.)
In addition, Feliciano, while well intentioned, did not have the benefit of the extensive training received by sign-language interpreters, aimed at preventing parenting.[8] *523 Thus, in good faith, she “interpreted” many of Rivera’s gestures and attempts at verbalization in accordance with what she expected he would say. At other times, as the trial transcript demonstrates, [9] the lack of communication was more apparent. Moreover, it is extremely doubtful whether her interpretation for Rivera during the trial of the other witness’ testimony was at all understood. Considering all these circumstances, the conclusion is inescapable that Rivera did not adequately comprehend or participate in the New Jersey trial at which he was convicted.
B. The Erie County Conviction
The People did not introduce the plea minutes of this conviction and it was conceded that no interpreter was present at the allocution. Rivera also testified that he had no interpreter at the time of pleading. He was unable to describe the proceedings, and what description he did give demonstrated his complete lack of understanding of the issues, his rights, and his waiver thereof. It is clear that he had no notion that he could have a jury trial, call witnesses on his behalf, or confront those against him. It is not even clear that he knew he had an attorney. Accordingly, I find, as a matter of fact, that Rivera did not knowingly and intelligently waive his rights in entering his plea of guilty.
In view of these factual conclusions, the ultimate issue to be resolved is whether the prior convictions were obtained in violation of Rivera’s constitutional rights so that due process would preclude their use in applying the second felony offender statute.
CONCLUSIONS OF LAW
The statute governing the procedure for determining whether a defendant is a second felony offender is CPL 400.21. Paragraph (a) of subdivision 7 places the burden of *524 proof on the People to prove beyond a reasonable doubt that the defendant “has been subjected to a predicate felony conviction”. I hold that the People have met this burden with regard to each of the prior convictions.
Paragraph (b) of subdivision 7 of the same statute further provides that: “A previous conviction in this or any other jurisdiction which was obtained in violation of the rights of the defendant under the applicable provisions of the constitution of the United States must not be counted in determining whether the defendant has been subjected to a predicate felony conviction.”
While it has been a matter of some debate as to what the burden of proof as to unconstitutionality should be and who bears it, the Court of Appeals recently resolved the issue in People v Harris (61 NY2d 9, 15), where it held that “[o]nce the fact of the prior conviction has been established, it is then incumbent upon the defendant to allege and prove the facts underlying the claim that the conviction was unconstitutionally obtained (CPL 400.21, subd 7, par [b]).” Moreover, “the presumptions of the validity and regularity of the previous convictions (People v Smyth, 3 NY2d 184; People v Bell, 36 AD2d 406, affd 29 NY2d 882; McCormick, Evidence [2d ed], § 343, p 807) [must be] overcome by substantial evidence to the contrary (People v Richetti, 302 NY 290).” (Supra, at p 16.) Thus, the burden shifts to defendant Rivera to prove that his convictions were unconstitutionally obtained. For the reasons stated below, I hold that Rivera has met this burden.
The initial question posed by Rivera’s constitutional challenge is whether a New York court has the power to review a foreign conviction. The New York courts have uniformly taken the position that such review is constitutionally permissible. (See People v Gonzalez, 61 NY2d 586; People v Bove, 70 AD2d 545; People v Elliott, 99 Misc 2d 794.)
The Federal courts have adopted the same view. In United States ex rel. LaNear v LaVallee (306 F2d 417, 420), the United States Court of Appeals for the Second Circuit recognized that New York courts must review another State’s conviction, because “in every practical sense [the] grievance is over what New York is doing [and not] what *525 [New Jersey] did.” While this may place a heavy burden on New York, the court continued, “ ‘to the extent that any State makes its penal sanctions depend in part on the fact of prior convictions elsewhere, necessarily it must assume the burden of meeting attacks on the constitutionality of such prior convictions.’ ” (Supra, at p 421 [citation omitted].)
The People counter that defendant is nevertheless precluded by collateral estoppel from challenging his prior convictions. They assert, relying on People v Abbott (113 Misc 2d 766), that defendant’s appeal to the New Jersey appellate court precludes a de novo review by this court of the constitutionality of the New Jersey conviction. This argument fails, however, as the People concede that the New Jersey appeal did not raise any constitutional issues with respect to the defendant’s hearing impairment. Nor was any appeal of the Erie County conviction ever taken. Thus, the facts sub judice are consistent with Abbott’s holding that where a foreign appellate court has not considered the constitutional issue, no questions of comity or collateral estoppel arise and the local trial courts are free to make an independent determination.
Since the People have failed to demonstrate that collateral estoppel precludes a review of the constitutionality of the prior convictions, the merits of defendant’s claim may be considered. The question, thus, is whether the failure to provide Rivera with a sign-language interpreter at his previous convictions deprive him of due process of law, as guaranteed by the United States Constitution.
Crucial to an analysis of this issue is an understanding of what an uninterpreted trial means to a deaf person. One commentator aptly summarized the experience: “For a deaf defendant * * * a * * * trial without some form of interpretive language assistance is reduced to an unintelligible and empty ritual. In an uninterpreted trial, a deaf defendant’s right to be heard in his own defense is significantly impaired, i.e., identification by the deaf defendant of factual misstatements is highly improbable and the opportunity for effective confrontation is correspondingly diminished. Furthermore, participation in defensive strategy through communication with counsel during the trial *526 phase is critically impaired.” (Note, Procedural Due Process: A Deaf Defendant’s Right to Be Heard Should Encompass A Right to “Hear” Civil Trials Through Interpretation, 29 Cath U L Rev 867-868.) An Alabama Judge recognized long ago that: “In the absence of an interpreter it would be a physical impossibility for the accused, a deaf-mute, to know or to understand the nature and cause of the accusation against him, and, as here, he could only stand by helplessly, take his medicine, or whatever may be coming to him, without knowing or understanding, and all this in the teeth of the mandatory constitutional rights which apply to an unfortunate afflicted deaf-mute, just as it does to every person accused of a violation of the criminal law.” (Terry v State, 21 Ala App 100, 102.)
New York recognized the due process implications of uninterpreted trials in 1972 when it enacted section 390 of the Judiciary Law, which requires that “Whenever any deaf person is a party to a legal proceeding of any nature * * * the court in all instances shall appoint a qualified interpreter of the deaf sign-language to interpret the proceedings to, and the testimony of, such deaf person.” Protecting the constitutional rights of hearing-impaired defendants was a central aim of this law. The memorandum of Senator Jess J. Present, accompanying the bill states:
“A court proceeding is often a difficult experience for persons with normal senses. Most people are not familiar with court proceedings; the problem is even greater for a deaf person. The services of a qualified interpreter would greatly expand the deaf person’s ability to communicate to the court, members of a jury and other persons interested in the proceedings.
“This present bill would also help to eliminate those few occasions where deaf persons have been held in jail for undue lengths of time due to the fact that they have not had the services of an interpreter to help them tell their story and provide the authorities with information to properly investigate the situation.” (NY Legis Ann, 1972, p 33.)
This law unquestionably reflects the New York Legislature’s view that a hearing-impaired person cannot receive a fair trial absent a qualified sign-language interpreter.
*527 The Nation’s courts in general, however, have been slow to understand the gravity of the rights at stake. A review of Federal, New York and nationwide case law has revealed surprisingly little about the rights of the hearing impaired to courtroom interpreters. (See, generally, Ann., 80 ALR2d 1084, and Supp.)
However, the analogous right of a non-English-speaking defendant to an interpreter has been more fully litigated. In its well-reasoned decision in United States ex rel. Negron v State of New York (434 F2d 386, 389), the Second Circuit found it a “nearly self-evident proposition that an indigent defendant who could speak and understand no English would have a right to have his trial proceedings translated so as to permit him to participate effectively in his own defense”. “It is axiomatic,” the court concluded (p 389), “that the Sixth Amendment’s guarantee of a right to be confronted with adverse witnesses * * * includes the right to cross-examine those witnesses as ‘an essential and fundamental requirement for the kind of fair trial which is this country’s constitutional goal.’ ” The New York courts have similarly held that a defendant who cannot understand English is entitled to have the trial testimony interpreted to him/her in a language which s/he understands in order that s/he may meaningfully assist in his/her own defense. (People v Ramos, 26 NY2d 727.)
Several other States have recognized this principle and applied it to their hearing-impaired defendants. In People v Lang (26 Ill App 3d 648, 655, cert den 423 US 1079),[10] the Illinois appellate court, relying on Pate v Robinson (383 US 375), ruled that a deaf mute defendant who was incapable of communicating could not constitutionally be tried without “special trial procedures to negative the effect of his incompetency.”* [11] The court held that the defendant was entitled to whatever was necessary to allow “ ‘for commu *528 nication to him of the testimony of the witnesses to insure him a full and fair exercise of his legal rights.’ ” (26 Ill App 3d, at p 653.)
In Terry v State (supra), the Alabama Court of Appeals held that an indigent defendant was entitled to a court-appointed interpreter. It reasoned that: “The constitutional right [to confront witnesses] would be meaningless and a vain and useless provision unless the testimony of the witnesses against him could be understood by the accused. Mere confrontation of the witnesses would be useless, bordering upon the farcial, if the accused could not hear or understand their testimony.” (21 Ala App, at p 102.)
“In other words”, the court continued, “the physical infirmity of this [defendant] can in no sense lessen his rights under the Constitution”. (21 Ala App, at p 102.)
This is unfortunately precisely what occurred at the New Jersey trial. The evidence adduced at the hearing and the facts as I have found them lead inexorably to the conclusion that Rivera did not and could not adequately participate in his own defense and that he had no real opportunity to confront the witnesses against him. The lack of communication was so fundamental that, in effect, Rivera was also denied the effective assistance of counsel.
In view of these persuasive precedents and the clear mandate from the Legislature that the hearing impaired have an opportunity to fully understand court proceedings, I hold that Rivera’s New Jersey conviction was obtained in violation of his constitutional rights as guaranteed by the Sixth Amendment and the due process clause of the Fourteenth Amendment.
In addition, Rivera raises a persuasive Fifth Amendment claim. He testified at the hearing that he thought he was obligated to take the stand during the New Jersey trial on pain of going to jail. Had a qualified sign-language interpreter been present, this prejudicial misconception could have been avoided. I find, accordingly, that the New Jersey conviction was obtained in further violation of Rivera’s Fifth Amendment right to remain silent.
Finally, Rivera’s Erie County conviction based on a guilty plea must also be disregarded as unconstitutionally *529 obtained. Faced with a similar situation, a Federal Judge, in granting a writ of habeas corpus to a deaf petitioner who entered a guilty plea without a sign-language interpreter held in Mothershead v King (112 F2d 1004, 1006). “The conviction of a person whose infirmities are such that he cannot understand or comprehend the proceedings resulting in his conviction and cannot defend himself against such charges, is violative of certain immutable principles of justice. Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Sanders v. Allen, 69 App. D.C. 307, 100 F.2d 717, 720.” One such “immutable principle of justice” firmly embedded in our Federal and State Constitutions is that a waiver of constitutional rights be knowing, voluntary, and intelligent. (Johnson v Zerbst, 304 US 458, 464; People v Harris, 61 NY2d, at p 17.) Without a sign-language interpreter to explain the plea allocution, Rivera could not have been sufficiently informed to waive his Boykin rights. (Boykin v Alabama, 395 US 238.) In effect, Rivera was never advised of his rights, and, thus, the conviction entered on his guilty plea cannot be considered as a predicate felony (People v Harris, 61 NY2d, at p 22).
For the same reasons, I hold that Rivera’s failure to appeal either conviction based on inadequate interpretation cannot be viewed as a waiver of the right to raise that argument now. Any waiver would suffer from the same constitutional infirmities as the underlying convictions.
Rivera has met his burden of proving by substantial evidence that both the New Jersey and Erie County convictions were obtained in violation of his constitutional rights. It is beyond cavil that “[a] conviction obtained in violation of one’s constitutional rights may not be used to enhance punishment for another offense. (Burgett v. Texas, 389 US 109, 115.)” (People v Harris, 61 NY2d, at p 16.) ' Accordingly, the previous convictions may not be considered in determining punishment for the instant crime and the defendant will be sentenced as a first felony offender.

. The term “deaf” has historically had unfortunately negative connotations. For example, the 4th edition of Black’s Law Dictionary includes only an entry for “deaf and dumb” which reads, “A mati that is born deaf, dumb, and blind is looked upon by the law as in the same state with an idiot, he being supposed incapable of any understanding.” (Black’s Law Dictionary, p 487.) The most recent edition adopts a more functional definition, classifying as “deaf” “[a]ny person whose hearing is so seriously impaired as to prohibit the person from understanding oral communications when spoken in a normal conversational tone.” (Black’s Law Dictionary [5th ed, 1979], 359.) Perhaps because of this history advocates of the disabled generally prefer the term “hearing impaired”. However, since the expert witnesses and interpreters in this case used the terms interchangeably, and inasmuch as the literature specifically uses “deaf,” both terms will be used synonymously in this opinion.

. These two highly skilled interpreters are deserving of special mention. They worked tirelessly with the defendant and his attorney to insure that Rivera received the total benefit of counsel and a full and fair hearing. Rivera’s attorney, Steven Silberblatt of the Legal Aid Society also deserves the court’s appreciation for his stalwart insistence on full interpretation for his client and his unstinting devotion to insure that Rivera was accorded all his constitutional rights.

. P.S. 47 is the public school for the deaf which Rivera briefly attended. Granson was familiar with its admissions criteria and testified that although today persons with less than total hearing loss are accepted as students, in 1959 prospective students had to be deaf.

. Granson relied in part on a 1959 audiogram from the records of P.S. 47 which showed virtually the same results which she obtained in her testing. She testified that the state of the art of audiometry and its basic tests have remained essentially the same since after the Second World War, so that she considered the 1959 test reliable. Although the audiogram was uncertified, and thus not admitted into evidence because of a hearsay objection, Granson was permitted to consider it and use the information it contained in formulating her expert opinion. The test was of the kind ordinarily accepted by experts in the field and Granson was subject to cross-examination concerning it and the other bases of her opinion. (See People v Sugden, 35 NY2d 453.)

. There are several necessary preconditions to possession of the maximum level of lip-reading confidence. One, of course, is knowledge of the language being used. Dr. Frishberg explained that there is a large variation as to the amount of linguistic skills a person retains after losing her/his hearing, and that maintenance of spoken language skills is aided by substantial amounts of reading and writing. It is uncontroverted that Rivera is illiterate in both English and Spanish, so the likelihood that he possesses substantial linguistic skills is very small.

. Dr. Frishberg also explained that when a person speaks louder, in an attempt to make her/himself understood to a deaf person, there is a distortion of lip movements which increases the difficulty of lip-reading. This is precisely what Feliciano testified she did when she believed Rivera did not understand her.

. At most, Rivera can gutturalize Spanish words — some of which would be understandable to a Spanish-speaker. Indeed, Miller testified that the defendant came to be known by his office as “Squawky.”

. Indeed, Feliciano was apparently without any formal training in the art of interpreting. Considering the fundamental fairness entailed in proper interpreting and the enormous potential for error in translating both sign and foreign languages, it is imperative that all interpreters be educated, tested and periodically retrained to improve and assess their competence.
Some of the pitfalls that untrained translators fall into were outlined by Lowell F. Myers in his book, The Law and the Deaf (p 46): “The most common mistake of interpreters,” he writes “is to reject an answer given by the witness and to refuse to translate it because the interpreter feels the witness has misunderstood the question, or that the answer is not appropriate.”
He adds (pp 46-47): “Another common error of interpreters is to fail to understand that small differences in wording may be very important in a particular case * * * For example, if a deaf witness says, ‘About 5 feet,’ the interpreter should not say, ‘5 feet,’ leaving out the word ‘about.’ If a witness says, ‘A few hours,’ the interpreter should not change this to say, ‘2 or 3 hours.’ If a witness says, T think I was driving about 20 miles an hour,’ the interpreter should not shorten this to say, T was driving 20 miles an hour.’ Such words as T think,’ ‘about,’ ‘probably,’ may have great legal meaning.”
While Myers’ observations are made in the context of sign-language interpretation, I have frequently experienced the same phenomena with foreign language interpreters. Especially in the criminal context, such errors may have a devastating impact on a
*523 defendant’s constitutional rights.

. For instance, the following exchanges took place:
“Q. Where were you arrested at?
“A. I was in the little court.”
“Q. You indicated that a couple of days went by. She came to get you, is that correct?
“A. No, two doors, only two doors.”
“Q. Mr. Rivera, were they your tools or her tools?
“A. The first door was the front door and the second door was the rear door.”
“Q. Well, when you went there this morning, was it burned down or standing?
“A. No, the lady went to get me. She knows I can’t hear or talk.”

. This case inspired the best-seller book, Dummy, authored by the defendant’s trial lawyer.

. While the Illinois court viewed the defendant as incompetent to stand trial, a more accurate view is that the judicial system was incompetent to constitutionally try the handicapped defendant. A Judge of this court was recently faced with the problem of trying a deaf criminal defendant who completely lacks communication skills. Recognizing the due process problem involved, she ordered the defendant placed in a program that would teach him the requisite skills to enable him to stand trial. (People v Delgado, NYLJ, July 18, 1984, p 7, col 3.)