UNITED STATES of America

v.

Barry S. SCHEUR, et al.

Criminal No. 07–169.

United States District Court, E.D. Louisiana.

April 24, 2008.

James Alcee Brown, Liskow & Lewis, Shaun G. Clarke, Gerger & Clarke, New Orleans, LA, for Barry S. Scheur.

Joseph A. Capone, Gaven Dall Kammer, U.S. Attorney's Office, New Orleans, LA, for United States of America.

## ORDER & REASONS

ELDON E. FALLON, District Judge.

Before the Court are two motions in limine in this multi-defendant criminal matter. First is the government's motion regarding the need for special accommodations for the defendant Barry Scheur, in which the Court is asked to address various logistical challenges that may arise at trial due to the fact that Scheur is blind (Rec. Doc. 130). Second is the defendant Barry Scheur's motion challenging the admissibility of certain portions of an out-of-court statement made by his codefendant Rodney Moyer (Rec. Doc. 118). For the following reasons, the Court now finds (1) that Scheur is competent to stand trial, (2) that Scheur will be allowed to use his hand-held Braille computer at all times during the trial and that he may use Braille documents during his testimony, and (3) that certain portions of Moyer's statement must be redacted as specified below.

## I. BACKGROUND

In November 2005, a grand jury indicted Barry Scheur, Robert McMillan, and Rod-ney Moyer on charges of mail fraud and conspiracy stemming from the failure of The Oath for Louisiana, Inc., a health maintenance organization previously engaged in the insurance business in Louisiana. On February 17, 2006, the grand jury returned a superseding indictment which added an additional defendant, Danette Bruno, and several new charges. Six months later, on August 11, 2006, the grand jury returned a fourteen-count second superseding indictment charging the defendants with one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, five counts of mail fraud in violation of 18 U.S.C. § 1341, and eight counts of wire fraud in violation of 18 U.S.C. § 1343.[1] The second superseding indictment also includes a notice of forfeiture for any and all property which constitutes, or is derived from, proceeds traceable to the mail and wire fraud violations.

The government alleges that the defendants, who were principals and employees of The Oath, engaged in a conspiracy over several years to unjustly pay themselves approximately $6.1 million in management fees from the company, thereby defrauding The Oath itself, its insureds, and its medical service providers. The government alleges that the defendants maintained false and misleading accounting books and filed false and misleading financial statements with the Louisiana Department of Insurance to hide their activities. In April 2002, with its liabilities allegedly exceeding its assets by approximately $45 million, The Oath was placed in receivership by the Louisiana Department of Insurance and was eventually liquidated.[2]

---

1. Danette Bruno is not named in count two and, thus, is only charged with four counts of mail fraud.

2. The fallout from the failure of The Oath has been the subject of civil litigation as well. See *Egan Nursing Servs., Inc. v. Scheur*, No. 02–2564, 2003 WL 1701854 (E.D.La. Mar. 26, 2003); *Egan Nursing Servs., Inc. v. Scheur*,

On April 3, 2007, in light of the United States Supreme Court's holding in *Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), namely that the object of a federal fraud scheme must be property in the hands of the victim, the Court dismissed all counts of the indictment, the superseding indictment, and the second superseding indictment for failure to state offenses against the United States. *See United States v. Scheur*, No. 05–304, 2007 WL 1063301 (E.D.La. Apr. 3, 2007).[3] Following the dismissal of all charges, the grand jury returned a third superseding indictment within the time limit granted by 18 U.S.C. § 3288 which the Court subsequently found satisfied *Cleveland* without impermissibly broadening the original charges. *See United States v. Scheur*, No. 07–169, 2007 WL 2726083 (E.D.La. Sept. 17, 2007).[4] After numerous continuances, all four defendants are now scheduled to go to trial jointly on April 28, 2008.

## II. PRESENT MOTIONS

### A. Government's Motion Regarding Scheur's Special Needs

The government's motion in limine concerning the logistics of trial comes at the Court's direction following the government's allegedly fruitless informal discussions with defense counsel about Scheur's disability. The Court was first made aware of the fact that Scheur is blind in a letter from the government dated March 19, 2008.[5] The Court convened a status conference on March 25, 2008 to discuss the matter, but at that time defense counsel, citing Scheur's Fifth Amendment privilege against self-incrimination, refused to reveal whether Scheur would need special accommodations at trial in the event that he testifies or in generally following the proceedings. Accordingly, the Court directed the government to file a motion so that these issues could be formally addressed on the record.

In its motion, the government recognized that due process requires that Scheur be able to understand the charges made against him. Therefore, the government requested that the Court question Scheur and perhaps even his counsel on the record, outside the presence of government counsel if necessary, to determine whether any special accommodations need to be made for the upcoming trial. The government also requested that Scheur be prohibited from using any Braille documents at trial that have not previously been certified as accurate translations and turned over to the government for inspection.

In responding to the motion in writing, Scheur faulted the government for ignoring the practical implications of trying a blind defendant and again asserted his privilege against self-incrimination.

---

No. 02–2564, 2003 WL 1701790 (E.D.La. Mar. 26, 2003); *Egan Nursing Servs., Inc. v. Scheur*, No. 02–2564, 2003 WL 1701705 (E.D.La. Mar. 26, 2003); *Egan Nursing Servs., Inc. v. Scheur*, No. 02–2564, 2003 WL 1699355 (E.D.La. Mar. 26, 2003).

**3.** The Court had previously refused to dismiss the charges on this ground. *See United States v. Scheur*, No. 05–304, 2007 WL 29065 (E.D.La. Jan. 3, 2007).

**4.** Because all previous indictments had been dismissed and criminal action number 05–304 had been closed, the Court treated this third superseding indictment as a "new indictment" and directed the clerk's office to open the instant case file, which has been assigned criminal action number 07–169.

**5.** Although defense counsel contends that Scheur's disability was disclosed to the Court in a prior pleading, counsel has not provided an exact citation. The Court does not recall such a disclosure and has been unable to locate one upon a brief review of the record.

Scheur informed the Court, however, that he will be able to follow oral testimony at trial and contended that due process will be satisfied by the government providing him with certified Braille translations of the exhibits it intends to offer into evidence. But in a supplemental brief, Scheur moved away from this position by arguing that his disability may render certain exhibits altogether inadmissible at trial.

On April 11, 2008, the Court heard oral argument from counsel and agreed to schedule an evidentiary hearing to inquire into the nature and extent of Scheur's disability.[6] On April 14, 2008, in advance of the hearing, the Court informed the parties that it envisioned a two-phase hearing during which (1) the Court would question Scheur in camera, under seal, and outside the presence of counsel for the government to inquire into the nature and extent of his disability in order to determine what accommodations, if any, will be necessary at trial; and (2) the parties would then be allowed to present in open court any additional evidence and/or testimony from witnesses that they feel would be helpful to the Court in determining what accommodations, if any, will be necessary at trial. *See* Rec. Doc. 170.

On April 16, 2008, one day before the evidentiary hearing, Scheur moved for an expedited competency hearing under 18 U.S.C. § 4241. Tacking even further from his original position, Scheur now argues that reasonable cause exists to believe that his disability may prevent him from understanding the nature and consequences of the proceedings against him and from assisting properly in his defense. Although § 4241 speaks of "mental competency," Scheur notes that courts have utilized the process set forth in the statute to address questions of competency raised by physical disabilities. *See, e.g., United States v. Jones,* 495 F.3d 274, 276–77 (6th Cir.2007).

The next morning, prior to beginning the evidentiary hearing, the Court informed all counsel that it would grant Scheur's motion for an expedited competency hearing and that the previously scheduled evidentiary hearing would also serve as a competency hearing. The Court reasoned that pursuant to 18 U.S.C. § 4241(c) and 18 U.S.C. § 4247(d), Scheur was entitled to a competency hearing where he is "represented by counsel and . . . afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." Because the proposed agenda for the second phase of the evidentiary hearing tracked these requirements, the Court saw no reason to schedule a separate competency hearing and counsel for all parties eventually agreed. *See* Rec. Doc. 188.[7]

## B. Scheur's Motion Regarding Moyer's Statement

Scheur's motion in limine challenges the admissibility of certain portions of an out-

---

**6.** In light of the fast-approaching trial date of April 28, 2008, the Court proposed to hold the hearing on either April 14, 2008 or April 15, 2008, but Scheur's counsel informed the Court that he had conflicts on both days. The Court then scheduled the evidentiary hearing for April 16, 2008. Defense counsel subsequently informed the Court that a witness he intended to call at the evidentiary hearing had a conflict with the April 16, 2008 hearing date. Therefore, at the request of Scheur's counsel, and receiving no opposition from the government, the Court reset the evidentiary hearing for April 17, 2008.

**7.** Although most mental competency hearings are preceded by a psychiatric or psychological examination of the defendant, § 4241(b) does not require that such an examination take place. In the context of this case, where Scheur argues that his physical disability may affect his competence, the Court found that such an examination was unnecessary.

of-court statement given by one of his codefendants. On October 15, 2003, Rodney Moyer voluntarily gave a statement to the Office of Labor Racketeering and Investigations, a division of the U.S. Department of Labor's Office of Inspector General, regarding his work with Scheur and The Oath. At trial, the government intends to elicit portions of Moyer's statement from an agent who conducted the interview, but does not intend to offer the written report prepared by the Office of Labor Racketeering and Investigations into evidence.

In the instant motion, Scheur argues that various parts of Moyer's statement directly implicate him in accounting matters that form the basis for the indictment in this case. Therefore, Scheur asks the Court to exclude these portions of Moyer's statement under the Confrontation Clause of the Sixth Amendment as interpreted by *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Assuming that Moyer does not testify at trial, the government has agreed to certain redactions and has also informed the Court that it does not intend to utilize several other parts of the statement challenged by Scheur. The parties continue to disagree, however, on whether or not portions of five separate paragraphs of Moyer's statement must be excluded. The Court will discuss each of these matters in turn.

## III. LAW & ANALYSIS

### A. Scheur's Competency

■■■■ "[T]he conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to sum-

mon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Riggins v. Nevada,* 504 U.S. 127, 139–40, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring in the judgment). The test for competence is well-settled:

> [T]o be competent, a defendant must be able to (1) consult with the lawyer with a reasonable degree of rational understanding, (2) otherwise assist in the defense, (3) have a rational understanding of the criminal proceedings and (4) have a factual understanding of the proceedings.

*United States v. Duhon,* 104 F.Supp.2d 663, 670 (W.D.La.2000) (citing *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) and *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)).

■■■■ Scheur contends that he is incompetent to stand trial in this case because he has no way to comprehend the financial documents that are likely to be offered into evidence by the government and, thus, that he will not be able to meaningfully assist in his defense. However, the testimony presented during the competency hearing leads the Court to find by a preponderance of the evidence that Scheur is competent to stand trial in this case and that he is able to both understand the nature and consequences of the proceedings against him and to assist in his defense.

Scheur was the first witness to testify at the competency hearing. Notwithstanding the fact that Scheur has been blind since birth due to a condition known as retrolental fibroplasia, he has led a very unique and successful professional life, both as a lawyer and a healthcare executive. After graduating *magna cum laude* from Tufts

University, Scheur received his law degree from Yale Law School. Scheur began his professional career by working for several law firms before accepting an in-house counsel position with a healthcare organization. Then in 1988, Scheur formed his own healthcare management and consulting firm, The Scheur Management Group. Over the years, Scheur has managed and served as a consultant for hundreds of health insurance plans. Indeed, Scheur has touted himself as a "managed care iconoclast."[8]

Scheur detailed the two primary alternative methods that he has utilized throughout his career to absorb written information that he cannot otherwise see—reading Braille and listening.[9] The most passive method at Scheur's disposal is to have someone (or something) read a document to him aloud. This can require the presence of another person, but it is also possible for him to scan certain documents into a machine which then reads them aloud in a synthetic voice. Moreover, screen-reading software on Scheur's Windows-based computer is also able to read certain documents and e-mails to him in a synthetic voice. Scheur's preferred method, however, is to read Braille in one of two ways. Scheur reads Braille in the traditional fashion on embossed paper and also utilizes a hand-held Braille computer that is able to instantaneously translate certain electronic files into Braille characters. Scheur's central argument in this case is that he is incompetent to stand trial because none of these methods can be utilized to convey the contents of financial documents meaningfully.

Dr. Harold Snider's testimony, the only other witness to testify at the competency hearing, calls into question Scheur's argument that he cannot comprehend the financial documents in this case. Dr. Snider, who also happens to have been blind since birth, has lead an equally impressive professional life. After graduating from Georgetown University's School of Foreign Service, he received a master's degree from King's College in London and his doctorate from New College at Oxford. Dr. Snider has run his own consulting company for approximately three decades that focuses on providing various forms of access for handicapped individuals. In the early 1990s, he was appointed by the President of the United States to be the Deputy Executive Director of the National Council on Disability. He has also served as the Executive Director of the International Braille Research Center in Baltimore, Maryland. At the competency hearing, the Court accepted Dr. Snider as an expert in the field of communication techniques for the blind.

Dr. Snider testified that financial documents can generally be represented in Braille in two different ways. First, financial spreadsheets can be represented in Braille in paragraph form, with each Braille paragraph containing the contents of one column of the spreadsheet, albeit in a horizontal orientation. Dr. Snider testified that this translation method is used by most banks today for simple bank statements sent to blind customers, but that the method becomes less feasible as a financial document becomes more complex. Second, financial documents can also be represented in Braille in tabular form. This

---

8. *See* http://www.scheur.com/scheur.nsf/smg/aboutstbss.htm (last visited April 23, 2008).

9. Braille is a code system first devised in 1821 by Louis Braille in France that is widely used today by blind people to read and write by using their sense of touch. Each Braille character is made up of six dots raised in various patterns and arranged in a rectangle containing three rows of two dots each.

alternative translation method attempts to maintain the organizational structure of the original document, but Dr. Snider testified that it can require expensive computer software to produce and may only be comprehensible by a trained reader.

Although the Court recognizes that neither of these alternatives are perfect substitutes for comprehending a financial document visually, this fact does not render Scheur incompetent in this case. Indeed, many of the government's proposed exhibits are copies of documents from The Oath's own files, the contents of which it must be presumed Scheur has either previously devised a method of absorbing or ignored at his peril. In fact, Scheur testified that he relies heavily on other people to synthesize and present information to him in a summary fashion. And Dr. Snider testified that blind individuals are obviously able to understand the "bottom line" of financial documents when such information is conveyed orally. In sum, having dealt with the reality of not being able to see financial documents his entire professional career, but nevertheless having engaged in, and become an expert (according to his own web site) in, advising and running healthcare companies, Scheur simply cannot come to this Court on the eve of trial purporting to be incompetent on this ground.

### B. Government's Motion Regarding Scheur's Special Needs

■ Although Scheur is competent to stand trial, the Court's inquiry into this matter is not at an end. Indeed, the government has filed a motion asking the Court to determine whether or not Scheur is entitled to any special accommodations at trial as a result of his disability. Scheur contends that due process will be satisfied in this case if the government provides him with certified Braille translations of the exhibits it intends to offer into evidence. In addition, Scheur argues that certain exhibits may be altogether inadmissible if they cannot be adequately translated into Braille. The Court has previously required that the government turn over all of the exhibits it intends to use at trial to the defendants by April 4, 2008—more than three weeks prior to trial. See Rec. Doc. 64. For the following reasons, the Court will provide Scheur with several additional accommodations such that the various methods and technology he has utilized throughout his life to cope with his disability will be available to him at trial.

Defense counsel suggests that Scheur is the first blind person ever indicted for financial fraud. Whether or not this is in fact true, one thing is clear: it is not rare for disabled defendants to be indicted and tried. Indeed, the case law contains many references to blind defendants that have gone to trial on criminal charges. See, e.g., United States v. Rahman, 189 F.3d 88 (2d Cir.1999) (urban terrorism); United States v. Smith, No. 01–3063, 2006 WL 1041729 (D.Neb. Apr. 17, 2006) (possession with the intent to distribute cocaine); State v. Thornton, 10 S.W.3d 229 (Tenn. Crim.App.1999) (conspiracy to sell cocaine); State v. Young, 477 S.W.2d 114 (Mo.1972) (rape); Rogers v. State, 102 Tex. Crim. 444, 278 S.W. 446 (1925) (receipt of stolen property); Bishop v. State, 18 Ga. App. 714, 90 S.E. 369 (1916) (sale of whiskey). It appears even more common for deaf defendants to stand trial. See generally Deirdre M. Smith, Comment, Confronting Silence: The Constitution, Deaf Criminal Defendants, and the Right to Interpretation During Trial, 46 Me. L. Rev. 87 (1994) (collecting cases).

The Supreme Court of Illinois has set forth an authoritative road map for courts to follow when faced with the trial of a disabled defendant:

The general rule in handling the trial of a criminal defendant who is handicapped by deafness, blindness or other affliction is that a trial judge should afford such a defendant reasonable facilities for confronting and cross-examining the witnesses as the circumstances will permit. He need only give such aid to intelligent appreciation of the proceeding as a sound discretion may suggest. The fact of blindness or deafness of the accused may lessen the ability and capacity of the defendant to utilize his constitutional rights, but this will not prevent his being subject to trial. In the proper administration of justice, however, the court should give a person accused of crime a reasonable opportunity to obtain the benefit of his constitutional rights.

*People ex rel. Myers v. Briggs*, 46 Ill.2d 281, 263 N.E.2d 109, 113 (1970). To exercise its discretion in this respect, however, "the court must first make some meaningful inquiry into the nature and extent of the defendant's [disability]." *People v. Williams*, 331 Ill.App.3d 662, 265 Ill.Dec. 136, 771 N.E.2d 1095, 1099 (2002). As noted above, the Court conducted an evidentiary hearing on April 17, 2008 regarding Scheur's disability and is now prepared to exercise its discretion.

"The constitutional guarantee of due process in a criminal trial 'is, in essence, the right to a fair opportunity to defend against the State's accusations.'" *Ferrell v. Estelle*, 568 F.2d 1128, 1131 (5th Cir. 1978) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). "That guarantee encompasses both the right of a defendant to confront witnesses against him and his right to assist in his own defense." *Id.* But as the United States Court of Appeals for the Fifth Circuit further explained in *Ferrell*, a case involving a deaf defendant, these rights are not absolute:

The Constitution does not, however, guarantee every defendant a perfect trial. The rights vouchsafed are practical, reasonable rights rather than ideal concepts of communication, and even these pragmatic rights may not be exercised without limit. The Constitution does not require that every defendant comprehend the English language with the precision of a Rhodes Scholar or appreciate the nuances of a witness' expressions or behavior with the skill of a doctor of psychology. Nor may a defendant press the exercise of his right to the point at which he disrupts the public's right to an orderly trial.

*Id.*[10]

It seems obvious to the Court that a blind defendant such as Scheur will have less difficulty appreciating the proceedings at trial than would, say, deaf defendants and defendants that do not speak English. Indeed, unlike these later categories of defendants, Scheur has informed the Court that he will be able to follow the oral testimony at trial without any special accommodations. Thus, the need for an interpreter does not arise in this case. *Cf. United States ex rel. Negron v. New York*, 434 F.2d 386, 389–90 (2d Cir.1970) ("[T]he government does not dispute the nearly self-evident proposition that an indigent defendant who could speak and understand no English would have a right to have his trial proceedings translated so as to permit him to participate effectively in his own defense."); *United States v. Carrion*, 488

---

**10.** The Fifth Circuit later withdrew its opinion in *Ferrell* to prevent injustice when it was informed that the petitioner had died prior to the issuance of the original opinion. *See Fer-* *rell v. Estelle*, 573 F.2d 867 (5th Cir.1978). To the extent that the Fifth Circuit's views in *Ferrell* are rendered non-binding as a result, the Court adopts them here as its own.

F.2d 12, 14 (1st Cir.1973) ("The right to an interpreter rests most fundamentally, however, on the notion that no defendant should face the Kafkaesque spectre of an incomprehensible ritual which may terminate in punishment."); *People v. Rivera,* 125 Misc.2d 516, 480 N.Y.S.2d 426, 432 (N.Y.Sup.Ct.1984) (holding that "the failure to provide [a deaf defendant] with a sign-language interpreter ... deprive[d] him of due process of law").[11]

During the evidentiary hearing, Scheur testified that he relies heavily on his hand-held Braille computer to read and write notes. Indeed, Scheur testified that he cannot write by hand, and that he would only be able to communicate with his counsel in writing during the trial by using this device. Accordingly, the Court will allow Scheur to use his hand-held Braille computer at all times during the trial. Scheur also testified that he reads Braille. Therefore, in the event that Scheur testifies, the Court will allow him to utilize Braille translations of any exhibits, provided that such translations are turned over to the government in Braille at least three days in advance of such testimony for inspection.

The Court will not, however, require the government to turn over Braille translations of all of its proposed exhibits. As noted above, many of the government's proposed exhibits are copies of documents from The Oath's own files that Scheur has had access to for multiple years by virtue of running the company and also as a result of subsequent civil and criminal litigation. And at a bare minimum, pursuant to this Court's scheduling order, Scheur has had access to the specific documents the government intends to introduce at trial since April 4, 2008. However, if the government intends to utilize Braille documents during its cross-examination of Scheur, such documents must be turned over to the defense in Braille at least three days prior to such testimony for inspection.

During the evidentiary hearing, Scheur also testified that he has not been able to review any of the government's proposed exhibits because they have been provided in an electronic format designed for storing images, specifically in the tagged image file format (TIFF), and that current technology does not allow such files to be mechanically translated into Braille nor read aloud by a machine. To be precise, Scheur testified that his counsel recently sent him an e-mail with several such exhibits attached and that his computer was not able to open nor read the attachments. At that point, rather than employing what would seem to be the only reasonable alternative in this case (and indeed the alternative that he appears to have utilized throughout his career), namely reviewing the government's exhibits orally with counsel or another person, Scheur has come to this Court seeking to be declared incompetent or, alternatively, to force the government to reproduce these documents manu-

---

11. The Court is not insensitive to Scheur's condition, but suggests that, in terms of his ability to exercise his Constitutional rights, Scheur is in a much better position that many other disabled defendants. *See, e.g., Galloway v. Superior Court,* 816 F.Supp. 12, 16 (D.D.C. 1993) (holding that the categorical exclusion of blind persons from jury service was contrary to law and noting that "blind individuals, like sighted jurors, [can] weigh the content of the testimony given and examine speech patterns, intonation, and syntax in assessing credibility"); *see also, e.g., Livingston v. State,* 800 So.2d 532, 535 (Miss.Ct.App. 2001) (holding that the trial court was not required to appoint counsel for a blind defendant's parole revocation hearing). Indeed, much like the plaintiff in *Galloway,* Scheur's "educational and employment history underscores the fact that he can, and does, make credibility determinations daily." *Galloway,* 816 F.Supp. at 18.

ally in an alternate form. Based on the practical realities discussed above, however, the Court concludes that Scheur has already been provided "a reasonable opportunity to obtain the benefit of his constitutional rights," *People ex rel. Myers v. Briggs*, 46 Ill.2d 281, 263 N.E.2d 109, 113 (1970), and that beyond the noted provisions, no further accommodations will be made.

## C. Scheur's Motion Regarding Moyer's Statement

■ "The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right 'to be confronted with the witnesses against him.'" *United States v. Lage*, 183 F.3d 374, 385 (5th Cir.1999) (quoting U.S. Const. amend. VI). "The right of confrontation includes the right to cross-examine witnesses." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Therefore, as a general matter, "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." *Id.* In *Bruton v. United States*, the Supreme Court noted:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect.... The unreliability of such evidence is intolerably compounded when the [codefendant] ... does not testify and cannot be tested by cross-examination.

391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (internal citations omitted).

As subsequent cases have explained, however, with regard to a statement of a non-testifying codefendant, "[t]here is an important distinction" between an out-of-court statement that "expressly implicat[es] the defendant as [an] accomplice" and an out-of-court statement that is "not incriminating on its face." *Richardson*, 481 U.S. at 208, 107 S.Ct. 1702. The Fifth Circuit has fleshed out this important distinction: "*Bruton* is inapplicable unless the codefendant's out-of-court statement directly incriminates the non-confessing defendant without reference to other, admissible evidence." *United States v. Mann*, 161 F.3d 840, 860 (5th Cir.1998) (internal quotation omitted). Moreover, even if a codefendant's out-of-court statement does directly incriminate the non-confessing defendant, "the Confrontation Clause is not violated by the admission of a [such a statement] with a proper limiting instruction when ... the [statement] is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702.[12]

---

**12.** Although the rule of "*Bruton* has been limited ... to cases where the admission of the incriminating statements was not within a firmly rooted exception to the hearsay rule," *United States. v. Saks*, 964 F.2d 1514, 1525 (5th Cir.1992), the government appears to concede that *Bruton* applies in this case. Indeed, the government does not argue that the challenged portions of Moyer's statement are admissible under a firmly rooted exception to the hearsay rule. *Cf. Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (approving of the admission of incriminating, out-of-court statements by a non-testifying coconspirator).

■ As noted above, the parties continue to disagree on whether or not portions of five separate paragraphs of Moyer's statement must be excluded under *Bruton* and its progeny. Accordingly, for each of the challenged paragraphs the Court will reproduce the paragraph in its entirety, summarize the parties' positions, and then set forth an acceptable redaction if in fact a redaction is necessary.[13]

### 1. Paragraph Three

In 1990 Diane Stone, who was working with Barry Scheur at the time, recruited Moyer to assist with establishing a health plan with Hershey Foods through Blue Cross/Blue Shield. Moyer took the position because he knew of Scheur's reputation within the Industry. Moyer was aware that Scheur had previously compiled a 2–3 hundred-page manual on HMO guidelines and regulations for the National Association of Managed Care Regulators. Moyer described Scheur as being one of the first individuals to be involved in the HMO industry. In 1988 or 1989, while Moyer was at the Department of Insurance in New Jersey, he had worked with Scheur regarding the Foundation Health Plan. The commissioner of insurance in New Jersey had appointed Scheur the receiver for the failing plan. Scheur's responsibilities included locking down the remaining assets of the company, tracing money owed to the plan and conducting the Proof of Claim process. Moyer noted that one of the primary factors that led to problems at Foundation Health Plan was concerning the transfer of one million dollars by the parent company to themselves because of problems in other states. Scheur negotiated with the companies' owners in order to retrieve the money. He also assisted in preparing the original briefs to the courts. Moyer advised that Scheur had to educate the Attorney General's Office on the regulations.

Scheur argues that this paragraph details his alleged knowledge of healthcare accounting regulations and is offered solely for the purpose of incriminating him because the indictment in this case alleges that he violated these same accounting regulations. The government contends that this paragraph merely contains background information concerning Scheur's expertise in the healthcare field and Moyer's past experience working with Scheur, and that it in no way incriminates Scheur. The Court agrees with the government and finds that this paragraph is "not incriminating on its face." *Richardson,* 481 U.S. at 208, 107 S.Ct. 1702. Therefore, Scheur's motion will be denied in part with respect to paragraph three, which may be read in its entirety.

### 2. Paragraph Eleven

Moyer indicated that Alan Parker replaced Mary Keane on an acting basis. Some time in the Fall of 2001 Parker was angry with Scheur. Moyer described a screaming match he overheard in the hallway between Parker and McMillan regarding the quarterly filings. Parker had disagreed with the contents of the report. Moyer could not recall the details of the disagreement. Moyer also recalled being at a meeting in November of 2000 attended by McMillan, Scheur, Barrett, and Hand in which an argument between McMillan and Parker took place because Parker refused to sign the financial statements for the 3rd quarter.

13. Moyer's statement appears in the record as an attachment to Scheur's motion in limine.

*See* Rec. Doc. 118–3.

The government has agreed to redact the second sentence of this paragraph and proposes to replace McMillan's name in the third sentence with "another person." The government also proposes to replace the phrase "attended by McMillan, Scheur, Barrett, and Hand" in the sixth sentence with "with Parker and others," and to redact the phrase "between McMillan and Parker" from the sixth sentence altogether. Scheur is agreeable to the redaction of the second sentence in its entirety and to the redaction of "between McMillan and Parker" from the sixth sentence. However, Scheur argues that replacing McMillan's name in the third sentence with "another person" and replacing "attended by McMillan, Scheur, Barrett, and Hand" in the sixth sentence with "with Parker and others" creates ambiguities that could lead the jury to improperly conclude that Scheur may have been involved in these activities.

The Court finds that Scheur's remaining objections to this paragraph are well founded and that the statement must be redacted "to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson,* 481 U.S. at 211, 107 S.Ct. 1702. Accordingly, Scheur's motion will be granted in part with respect to paragraph eleven, which, in light of the agreed upon redactions, shall now read as follows:

> Moyer indicated that Alan Parker replaced Mary Keane on an acting basis. Moyer described a screaming match he overheard in the hallway regarding the quarterly filings. Parker had disagreed with the contents of the report. Moyer could not recall the details of the disagreement. Moyer also recalled being at a meeting in November of 2000 in which an argument took place because Parker refused to sign the financial statements for the 3rd quarter.

### 3. Paragraph Sixteen

> Moyer was asked about the receivable booked from the parent company, Venture Health Partnership Group. He advised that it was Scheur's idea to book receivables from the parent company. Because VHPG is Scheur's private company, he could give his word about the amount, no backup documentation was needed. Moyer did not know if Scheur had the funds to cover this amount.

The government has agreed to redact the second and third sentences of this paragraph in their entirety. Scheur argues that the fourth sentence must also be redacted because it incriminates him by supporting the government's charge that The Oath was under-capitalized. The Court finds that Scheur's objection to the fourth sentence is well founded and, thus, that it must be redacted as well. Therefore, Scheur's motion will be granted in part with respect to paragraph sixteen, which shall now read as follows:

> Moyer was asked about the receivable booked from the parent company, Venture Health Partnership Group.

### 4. Paragraph Twenty–Six

> Moyer told Scheur that he was glad his signature was not on any of the financial reports because he was uncomfortable with some of the things listed on the reports. His chief concern was Scheur's representations that he could cover the monies needed for the company. Scheur told Moyer that he could cover the receivables that his parent company owed to The Oath. Moyer never saw any evidence that he could do what he said. In the Fall of 2001, Moyer began confronting Scheur regarding his statements that he could cover it.

The government has agreed to redact the third and fifth sentences of this para-

graph in their entirety, and has proposed several substitutions for the remaining sentences. The government proposes replacing "Scheur" in the first sentence with "another Oath executive" and replacing "Scheur's representations that he" in the second sentence with "whether Scheur." The government also proposes replacing "he could do what he said" in the fourth sentence with "Scheur could cover the monies needed for the company." With respect to the first sentence, Scheur argues that the phrase "told Scheur" should be replaced with "stated." Scheur argues, however, that the government's proposed substitutions in the second and fourth sentences are unacceptable and do not cure the *Bruton* problems in those sentences. The Court finds that Scheur's objections to this paragraph are well founded. Accordingly, Scheur's motion will be granted in part with respect to paragraph twenty-six, which shall now read as follows:

> Moyer stated that he was glad his signature was not on any of the financial reports because he was uncomfortable with some of the things listed on the reports.

### 5. *Paragraph Twenty–Seven*

Moyer described Scheur's blindness as "no liability whatsoever." He stated that Scheur got through law school before there was wide scale use of computers. Scheur told him he had readers to read to him his lessons. Scheur would ask about the numbers contained in the financial reports and he knew what was being presented to the DOI. Moyer stated that "if he says he was hoodwinked, that's bullshit" when asked if Scheur could say that he didn't know what was going on in the company. In his last conversation with Scheur in May or June of 2003, Scheur thought it "entertaining" that Robert McMillan would get

nailed. Nancy Belle told Moyer he would be indicted as well.

Scheur argues that this paragraph details his alleged access to information in the financial reports and is offered solely for the purpose of incriminating him because the indictment in this case alleges that these financial reports were fraudulent and misleading. The government informs the Court that it does not presently intend to offer the fifth, sixth, and seventh sentences of this paragraph. The government argues, however, that the first four sentences do not directly incriminate Scheur "without reference to other, admissible evidence." *Mann,* 161 F.3d at 860. The Court finds that Scheur's objections to this paragraph are well founded and, thus, that paragraph twenty-seven must be redacted in its entirety. Therefore, Scheur's motion will be granted in part with respect to paragraph twenty-seven.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, the Court finds that the defendant Barry Scheur is competent to stand trial. Furthermore, IT IS ORDERED that the government's Motion in Limine Regarding Special Needs of Defendant Scheur (Rec. Doc. 130) is GRANTED IN PART such that (1) the Court will allow Scheur to use his hand-held Braille computer at all times during the trial, (2) the Court will also allow Scheur to utilize Braille documents during the course of his testimony, but only if such documents are turned over to the government in Braille at least three days prior to such testimony for inspection, and (3) if the government intends to cross-examine Scheur using Braille documents, such documents must be turned over to the defense in Braille at least three days prior to such testimony for inspection. Beyond these provisions, the Court

finds that Scheur is not entitled to any additional accommodations in this case.

IT IS FURTHER ORDERED that Scheur's Motion in Limine to Exclude Underlined Portions of Statement by Rodney Moyer (Rec. Doc. 118) is GRANTED IN PART and DENIED IN PART as specified above.